**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION** : | |
| : | |
| **Plaintiff,** : | |
| : | |
| **vs.** : | **Civil No. 2:19-5536** |
| : | |
| **GENE DANIEL LEVOFF** : | |
| : | |
| **Defendant.** : | |
| : | |

Plaintiff United States Securities and Exchange Commission ("SEC" or the "Commission") alleges the following against Defendant Gene Daniel Levoff ("Levoff"):

## SUMMARY

1. This matter concerns insider trading by Levoff, the Senior Director of Corporate Law and Corporate Secretary of Apple, Inc. ("Apple"). Levoff exploited his positions as a senior attorney and a member of Apple's Disclosure Committee to unlawfully trade Apple securities ahead of Apple quarterly earnings announcements.

2. In two key respects, Levoff's misconduct violated the duty of trust and confidence he owed Apple and its shareholders. First, as head of the Corporate Law group at Apple, Levoff was responsible for ensuring compliance with the company's insider trading policy and determining the criteria for those employees (including himself) restricted from trading around quarterly earnings announcements. At the same time, as a member of Apple's Disclosure Committee, Levoff received material nonpublic information about Apple's financial results. The

Disclosure Committee reviews Apple's periodic earnings results and draft public filings before that information is released to the public.

3.      On at least three occasions in 2015 and 2016, Levoff traded on the basis of insider information.  For example, in July 2015 Levoff received material nonpublic financial data that showed Apple would miss analysts' third quarter estimates for iPhone unit sales.  Between July 17 and the public release of Apple's quarterly earnings information on July 21, Levoff sold approximately $10 million dollars of Apple stock – virtually all of his Apple holdings – from his personal brokerage accounts.  Apple's stock dropped more than four percent when it publicly disclosed its quarterly financial data.  By trading on this material nonpublic information, Levoff avoided approximately $345,000 in losses.

4.      Levoff breached his duty of confidentiality to Apple and its shareholders and exploited corporate information for his own benefit.

5.      Through his illegal insider trading in 2015-2016, Levoff profited and avoided losses of approximately $382,000.

6.      By engaging in this conduct, Levoff violated the antifraud provisions of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Section 17(a)(1) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(1)].  Unless enjoined, Levoff is likely to commit such violations again in the future.

<u>**NATURE OF PROCEEDING AND RELIEF SOUGHT**</u>

7.      The SEC brings this action against Levoff pursuant to Section 21A [15 U.S.C. § 78u-l] of the Exchange Act and Section 20(b) of the Securities Act [U.S.C. § 77t(b)] seeking a judgment from the Court: (a) enjoining Levoff from engaging in future violations of Section

10(b) and Section 17(a); (b) ordering Levoff to disgorge an amount equal to the profits gained and losses avoided as a result of the actions described herein, with prejudgment interest; (c) ordering Levoff to pay a civil monetary penalty; and (d) prohibiting Levoff from serving as an officer or director of a public company.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), 21A and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-l, and 78aa(a)] and Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)].

9.     Levoff, directly or indirectly, used the means of interstate commerce and/or the facilities of a national securities exchange as described below.

10.     Venue in this district is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the sales of securities and acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred within this District, and were effected, directly or indirectly, by making use of the means, instruments or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of national securities exchanges.  Specifically, many of the securities trades alleged as part of the violations in this Complaint were routed through servers in Carteret, Secaucus, and Jersey City, New Jersey.  In addition, the servers of the firm that executed many of the trades were located in Carteret, Secaucus and Jersey City, New Jersey.

## DEFENDANT

11.     **Gene Daniel Levoff**, age 44, resides in San Carlos, California.  From 2008 to 2013, he was Director of Corporate Law at Apple.  From 2013 until his termination in September of 2018, he was Senior Director of Corporate Law at Apple, reporting directly to the General

Counsel.  Levoff also served on Apple's Disclosure Committee from September 2008 to July 2018, including as chair of the committee from December 2012 to July 2018.  Levoff previously held positions at a major law firm and another publicly-traded company.

## OTHER RELEVANT ENTITY

12.     Apple, Inc. is a consumer electronics and personal computer company incorporated in the state of California and headquartered in Cupertino, California.  At all relevant times, Apple was registered with the SEC pursuant to Section 12(b) of the Exchange Act [15 U.S.C.§ 78l(b)] and required to publicly file periodic reports containing financial results and other material information.  At all relevant times, Apple stock was publicly traded on the NASDAQ Global Select Market under the ticker symbol AAPL.

## FACTS

### A. Levoff Was an Insider Who Had a Duty to Apple and Its Shareholders Not to Trade on Apple's Material Nonpublic Information

*1. As a Senior Attorney and Member of Apple's Disclosure Committee, Levoff Was Entrusted with Material Nonpublic Information*

13.     As Director, and starting in 2013, Senior Director, of Corporate Law, Levoff oversaw the corporate law group at Apple, a group of approximately 20-30 attorneys and paralegals responsible for Apple's global corporate law issues.  Levoff was responsible for Apple's compliance with securities laws, including providing legal advice in connection with Apple's SEC filings and financial reporting, and for managing Apple's corporate subsidiary structure.  Levoff served as a corporate officer of every major Apple subsidiary.

14.     Since at least 2010, Levoff also had responsibility for ensuring compliance with Apple's insider trading policies.  Levoff sent, or supervised the sending of, notification emails to the list of individuals subject to trading restrictions around Apple's quarterly earnings

4

announcements (the "blackout list"), and determined the criteria for placement on the blackout list.  In 2015, Levoff initiated and implemented an update to Apple's insider trading policy.  In connection with that update, Levoff reviewed and commented on drafts and approved the final version of the policy.

15.     From 2008 until he was placed on leave in July of 2018, Levoff served on Apple's Disclosure Committee.  According to its charter, the Disclosure Committee was established to assist the Chief Executive Officer and Chief Financial Officer in fulfilling their responsibility for oversight of the accuracy and timeliness of disclosures made by Apple; determine Apple's disclosure obligations and ensure information contained in Apple's filings to the SEC and all other disclosures are timely, accurate, complete, and a fair representation of Apple's financial condition and results of operations; and ensure that Apple's disclosure controls and procedures are properly designed, adopted and implemented.

16.     The members of the Disclosure Committee changed over time, but typically included high level executives, including the Corporate Controller, the General Counsel, the Senior Director of Internal Audit, the Vice President of Finance and Sales, the Senior Director of Investor Relations and the Associate General Counsel of Corporate Law, which was Levoff's position.

17.     In light of his position at Apple as a senior attorney and member of the Disclosure Committee, Levoff was an insider who owed a duty of trust and confidence to Apple and its shareholders not to trade on the basis of material nonpublic information that he learned through his position at Apple.

    *2.     At the Time of His Trading, Apple Had Taken Steps to Prevent Employees, Such as Levoff, from Trading on Material Nonpublic Information*

18.     Prior to Levoff's illegal trading, Apple took steps to prevent employees from trading on material nonpublic information, including the undisclosed financial results Levoff received.  Apple had an insider trading policy that applied to all employees.  Many employees, including Levoff, also received notice when restricted trading periods, known as "blackout" periods, were in effect.  The notices, emailed to employees subject to the blackout periods, reminded them of the insider trading policy, and since at least 2015, included a link to the insider trading policy.

19.     Apple's insider trading policy in effect from 2003 to 2015 stated that:

Any person who possesses Material Nonpublic Information regarding the Company is an Insider for so long as the information is not publicly known.  Any employee . . . can be an Insider from time to time, and would at those times be subject to this Policy. . . .  No Insider shall engage in any transaction involving a purchase or sale of [Apple's] securities . . . during any period commencing with the date he or she possesses the Material Nonpublic Information concerning the Company, and ending sixty (60) hours after public disclosure of that information, or at such time as such nonpublic information is no longer material.

20.      The 2003 policy noted that the blackout period was required because "officers, directors and other employees . . . often will possess, during that period, Material Nonpublic Information about the expected financial results for the quarter."

21.     In 2015, under Levoff's supervision, Apple updated its insider trading policy and reaffirmed that employees should "[n]ever buy or sell stock when aware of information that has not been publicly announced and that could have a material effect on the value of the stock."  It also prohibited trading during blackout periods.

22.     Both the 2003 and the 2015 policy listed "financial results" as the first example of potential "material" information.

23.     Both the 2003 and 2015 policy warned Apple employees that insider trading by employees could result in criminal and civil penalties.

**B.  Levoff Learned Material, Nonpublic Information as a Member of Apple's Disclosure Committee and Traded on That Information in Breach of His Duty to Apple**

24.     From 2008 to 2018, Levoff's position on the Disclosure Committee provided him access to material nonpublic information.  The Disclosure Committee reviewed quarterly and annual financial materials, together with draft quarterly and annual reports ("Form 10-Qs" and "Form 10-Ks") and press releases, prior to their public filing.  About two weeks before the public release, each member of the Disclosure Committee, including Levoff, received emails attaching the information and drafts.  A few days before the public release, members of the Disclosure Committee, including Levoff, attended a meeting at which they discussed expected financial results.

25.     Levoff traded on material nonpublic information about Apple's earnings three times during 2015 and 2016.  Levoff also had a previous history of insider trading, having traded on Apple's material nonpublic information at least three additional times in 2011 and 2012.  For the trading in 2015 and 2016, Levoff profited and avoided losses of approximtely $382,000.

*The July 21, 2015 Earnings Announcement*

26.     On May 26, 2015, Levoff received an email notice stating that Apple had instituted a blackout period that would begin June 1 and last "until 60 hours after earnings are released in July 2015."  The email warned, "Note that trading is not permitted, whether or not in an open trading window, if you possess or have access to material information that has not been disclosed publicly."

27.     On Friday, July 10, 2015, Levoff and the other Disclosure Committee members received draft earnings materials regarding Apple's fiscal third quarter, including draft third quarter financials, press release, and prepared executive remarks.  The email stated that the

materials were "for review prior to our meeting on Monday morning."  The materials showed iPhone unit sales that fell short of analysts' expectations.

28.     Later that day, Levoff received a version of the draft Form 10-Q.  The email stated that the draft Form 10-Q "will also be discussed at the next Disclosure Committee meeting," and instructed members of the Disclosure Committee that they are "required to review the entire Form 10-Q" and should pay "particular attention" to specific disclosures regarding "material factors affecting the Company's operating results."

29.     The Disclosure Committee met the following Monday, July 13, 2015.  Levoff, acting as co-chair, participated by phone.  The Committee discussed material nonpublic information regarding the earnings materials and draft disclosures, as well as draft prepared remarks by the Chief Executive and Chief Financial Officers.

30.     On Friday, July 17, 2015, Apple reported that it would release its fiscal third quarter results on July 21.

31.     Between July 17 and the public release of Apple's quarterly earnings information on July 21, Levoff sold over 70,000 Apple shares held in brokerage accounts in his name for gross proceeds of approximately $10 million.

32.     On Tuesday, July 21, 2015, at 4:30 pm Eastern Time, Apple released its earnings for the fiscal third quarter.  The market reaction to the release of this information was sharply negative.  On July 22, 2015, a Bloomberg article stated that iPhone unit sales had fallen short of analyst expectations and estimates, "rekindl[ing] concerns over whether the company can keep making must-have products."

33.     By the end of trading on July 22, Apple's stock price had fallen more than four percent, eliminating roughly $32 billion in market value.

34.     By liquidating his Apple holdings, Levoff avoided approximately $345,000 in losses.

### *The October 27, 2015 Earnings Announcement*

35.     On August 27, 2015, Levoff received an email notice stating that Apple had instituted a blackout period that would begin September 1 and last "until 60 hours after earnings are released in October 2015."

36.     On Monday, October 12, 2015, Levoff and other members of the Disclosure Committee received an email attaching Apple's fiscal year 2015 draft annual report on Form 10-K.  The draft Form 10-K contained financial information which showed results that beat analysts' expectations for revenue and earnings per share.

37.     On Tuesday, October 13, 2015, the Disclosure Committee, including Levoff, received additional draft earnings materials regarding Apple's fiscal fourth quarter, including draft fourth quarter financials, press release, and prepared executive remarks.  On Friday, October 23, 2015, Apple reported that it would release its quarterly earnings results on October 27.

38.     On Monday, October 26, 2015, Levoff bought 10,000 shares of Apple stock at $115.70 per share in his personal brokerage account.

39.     Apple released its quarterly earnings on Tuesday, October 27, 2015, at 4:30 pm Eastern Time.  The market reacted positively to the announcement.  As a Fortune magazine article put it, Apple "beat[] market expectations for both revenues . . . and earnings . . ., driven by solid uptake for its large-screen iPhones and robust growth in Greater China."

40.     Between Apple's announcement on October 27 and the close of trading on October 28, Apple's share price increased more than four percent.

41.     On October 28, Levoff sold the 10,000 shares he purchased two days earlier, netting an illicit profit of roughly $4,700.

*The April 26, 2016 Earnings Announcement*

42.     On February 25, 2016, Levoff received an email notice stating that a blackout period would commence on March 1 and would last "until 24 hours after earnings are released in April 2016."

43.     On Friday, April 8, 2016, the Disclosure Committee received an email attaching Apple's draft Form 10-Q for its fiscal second quarter.  The draft Form 10-Q contained material nonpublic information about the company's quarterly financial results that revealed its first year over year revenue decline since 2003.

44.     On Friday, April 15, 2016, the Disclosure Committee received additional draft earnings materials regarding Apple's fiscal second quarter, including draft second quarter financials, press release, and prepared executive remarks.  Later that day, Levoff and the Disclosure Committee met to discuss the draft earnings materials.

45.     On Thursday, April 21, 2016, Levoff sold over 4,000 shares of Apple stock – virtually all of the Apple shares in his personal brokerage account.  The next day, Apple reported that it would release its fiscal second quarter results on April 26.

46.     On Tuesday, April 26, 2016, Apple publicly released its quarterly earnings.  The next day, Apple's stock closed down more than 6%, erasing tens of billions from its market capitalization.

47.     By selling over 4,000 Apple shares just six days earlier – during the blackout period when he knew that Apple was about to disclose its first revenue decline in thirteen years – Levoff avoided approximately $32,000 in losses.

*The 2011 and 2012 Earnings Reports*

48.     Levoff also engaged in insider trading prior to the three instances alleged above. On three separate occasions in 2011 and 2012, Levoff received nonpublic Apple earnings materials, including draft Form 10-Qs and press releases containing material nonpublic information, and then discussed them with the Disclosure Committee.

49.     In each instance, after receiving an email stating that Apple's pre-earnings release blackout period had begun, Levoff bought thousands of shares of Apple stock before the company released its earnings to the public.  He then sold them shortly after the public positive announcements of Apple's quarterly earnings.

50.     By engaging in insider trading in 2011 and 2012, Levoff made approximately $245,000 in profits.

**C.     Levoff Knew, or Was Reckless in Not Knowing, That He Traded on Material Nonpublic Information in Violation of His Duty to Apple and Its Shareholders**

51.     As a senior attorney at Apple that provided legal advice on securities laws, as a member and chair of the Disclosure Committee, and as an employee that received – and was primarily responsible for devising, implementing and enforcing – Apple's insider trading policy, Levoff knew, or was reckless in not knowing, that the earnings materials and filings the Disclosure Committee reviewed were material and nonpublic.

52.     Further, as a member of the core group of senior Apple insiders entrusted with material nonpublic information, and as an attorney with a sophisticated understanding of securities and corporate law, Levoff knew, or was reckless in not knowing, that he had a duty of trust and confidence to the company and its shareholders.

53.     As Levoff also knew, Apple's earnings information and related disclosures were confidential, and Apple established policies and procedures designed to prohibit its employees from trading on such information.

54.     In fact, Levoff shared responsibility for ensuring that employees complied with Apple's insider trading policies.  On at least three occasions in 2010 and 2011, Levoff sent emails to company employees notifying them that a blackout period was about to commence and that they were prohibited from trading Apple securities for the duration of the period.  In fact, Levoff sent two such emails immediately prior to his insider trading in 2011.

55.     For example, on February 24, 2011, Levoff sent an email to Apple employees explaining that a blackout period would begin on March 1, 2011, and remain in effect "until 60 hours after earnings are released in April 2011."

56.     The first sentence of Levoff's February 24, 2011 email stated: "REMEMBER, TRADING IS NOT PERMITTED, WHETHER OR NOT IN AN OPEN TRADING WINDOW, IF YOU POSSESS OR HAVE ACCESS TO MATERIAL INFORMATION THAT HAS NOT BEEN DISCLOSED PUBLICLY."

57.     In summary, Levoff, an Apple insider, traded on the basis of material, nonpublic information about Apple's earnings results in violation of the company's policies and in breach of the fiduciary duty that he owed to the company.

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

58.     The Commission re-alleges and incorporates paragraphs 1 through 57 as if fully set forth herein.

59.     By engaging in the conduct described above in 2015 and 2016, Levoff, with scienter, by use of the means or instrumentalities of interstate commerce, in connection with the purchase or sale of a security: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices or courses of conduct which operated or would operate as a fraud or deceit.

60.     By reason of the actions alleged herein, Levoff violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and unless restrained and enjoined will continue to do so.

**SECOND CLAIM FOR RELIEF**

**Section 17(a)(1) of the Securities Act**

61.     The Commission re-alleges and incorporates paragraphs 1 through 60 as if fully set forth herein.

62.     In 2015 and 2016, Levoff, by use of the means or instrumentalities of interstate commerce or of the mails, in the offer or sale of securities, directly or indirectly, with scienter, employed devices, schemes, or artifices to defraud.

63.     By reason of the actions alleged herein, Levoff violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)] and unless restrained and enjoined will continue to do so.

**PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court enter a judgment:

(i)     finding that Levoff violated the provisions of the federal securities laws as alleged herein;

13

(ii)     permanently restraining and enjoining Levoff from violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder and Section 17(a) of the Securities Act;

(iii)     ordering Levoff to disgorge an amount equal to the profits made or losses avoided as a result of the actions alleged herein that took place in the past five years and to pay prejudgment interest thereon;

(iv)     ordering Levoff to pay a civil monetary penalty equal to three times his disgorgement amount pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1];

(v)     issuing an order, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)], prohibiting Levoff from serving as an officer or director of a public company; and

(vi)     granting such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands trial by jury in this action of all issues so triable.

Date:   February 13, 2019

                                                                      __ /s/ Daniel J. Maher
                                                                     Daniel J. Maher, Mass. Bar No. 654711
                                                                     Pei Y. Chung, Ill. Bar 6282660
                                                                      Securities and Exchange Commission
                                                                      100 F Street, NE
                                                                       Washington, D.C. 20549
                                                                     Tel: (202) 551-4737 (Maher)
                                                                     Fax: (202) 772-9292
                                                                      Email: maherd@sec.gov