UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION<br><br>　　　Plaintiff,<br><br>　　　vs.<br><br>GENE DANIEL LEVOFF<br><br>　　　Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:    Civil No. 2:19-5536 |

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSIONS RESPONSE TO DEFENDANT GENE DANIEL LEVOFF'S LOCAL RULE 56.1 STATEMENT**

**A. LEVOFF'S STATEMENT OF FACTS**

1. From 2013 through September 2018, Levoff served as the Senior Director of Corporate Law for Apple.

**SEC Response: Admitted.**

2. On October 24, 2019, a federal grand jury returned a twelve-count Indictment charging Levoff with securities fraud and wire fraud in connection with purchase and sale transactions in Apple stock in 2015 and 2016.

**SEC Response: Admitted.**

3. On May 11, 2022, Levoff and the United States Attorney's Office for the District of New Jersey (the "USAO") entered into a written plea agreement pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) (the "Plea Agreement").

**SEC Response: Admitted.**

4. By the terms of that Plea Agreement, Levoff and the USAO agreed to a stipulated sentencing range of zero to 24 months and forfeiture of the full $604,000 in realized gains and avoided losses alleged in the Indictment, well over $200,000 more than the amount to which he pleaded guilty.

**SEC Response: Admitted.**

5. Levoff pleaded guilty on June 30, 2022.

**SEC Response: Admitted.**

6. At Levoff's sentencing on December 7, 2023, the Court considered a lengthy memorandum of sentencing considerations Levoff submitted, including two expert reports prepared by Dr. Catherine M. Barber ("Dr. Barber"), a highly regarded clinical psychologist.

**SEC Response: Admitted.**

7. In those Reports, Dr. Barber recommended, after an "extensive and long analysis of Mr. Levoff," a probationary sentence, opining that Levoff's conduct was an act of self-sabotage resulting from underlying mental disorders.

**SEC Response: Admitted.**

8. Dr. Barber conducted a detailed evaluation of Levoff and then became his treating therapist.

**SEC Response: Admitted.**

9. Dr. Barber's psychological evaluation of Levoff consisted of four videoconference interviews of him (totaling approximately eight hours), as well as a one and one-half hour interview of Levoff's sister, Lilly, and a 45 minute interview of Levoff's long-term partner, Ayelette Robinson.

**SEC Response: Admitted.**

10. On April 13, 2023, Dr. Barber began working as Levoff's mental-health treatment provider, meeting with him once (sometimes twice) a week by Telehealth.

**SEC Response: Admitted.**

11. Dr. Barber diagnosed Levoff with four mental disorders defined in the *Diagnostic and Statistical Manual of Mental Disorders* (revised 5th ed.): (1) Posttraumatic Stress Disorder, chronic (Complex PTSD); (2) Persistent Depressive Disorder with adolescent onset; (3) Bulimia Nervosa; and (4) Social Anxiety Disorder.

**SEC Response: Admitted.**

13. Dr. Barber opined, to a reasonable degree of psychological certainty, that those disorders "all converged to adversely affect [Levoff's] overall psychological functioning long before he committed the instant offenses" and "strongly impacted his judgment and decision-making capacities in the context of the offense conduct."

**SEC Response: Admitted that Dr. Barber stated the above. Because it is an unverifiable opinion, it is not appropriate for a Local Rule 56.1 Statement of Facts, as courts "disregard all factual and legal arguments, opinions and any other portions of the 56.1 Statement which extend beyond statements of facts."** *Rouse v. Hudson County Department of Family Services,* **2019 WL 2083301, at *1 n.1 (D.N.J. May 13, 2019).**

12. Those disorders, Dr. Barber explained in her reports, stem from and were greatly amplified by Levoff's volatile and mentally abusive relationship with his father, which robbed him of his self-worth and instilled in him a pathological desire to please others and obtain validation from those in positions of authority.

**SEC Response: Admitted that Dr. Barber stated the above. Because it is an unverifiable opinion, it is not appropriate for a Local Rule 56.1 Statement of Facts, as courts "disregard all factual and legal arguments, opinions and any other portions of the 56.1 Statement which extend beyond statements of facts."** *Rouse v. Hudson County Department of Family Services,* **2019 WL 2083301, at *1 n.1 (D.N.J. May 13, 2019).**

13. Dr. Barber opined, to a reasonable degree of psychological certainty, that those disorders "all converged to adversely affect [Levoff's] overall psychological functioning long before he committed the instant offenses" and "strongly impacted his judgment and decision-making capacities in the context of the offense conduct."

**SEC Response: Admitted that is what Dr. Barber said. Because it is an unverifiable opinion, it is not appropriate for a Local Rule 56.1 Statement of Facts, as courts "disregard all factual and legal arguments, opinions and any other portions of the 56.1 Statement which extend beyond statements of facts."** *Rouse v. Hudson County Department of Family Services,* **2019 WL 2083301, at \*1 n.1 (D.N.J. May 13, 2019).**

14. Expounding on that conclusion, Dr. Barber stated that while Levoff's disorders stem from and were exacerbated by his father's abusive conduct, they largely remained in check in school and through his early professional career (except for one episode of severe depression in high school):

> Early in his life, Gene feared his father's instability and felt he could never attain his love or approval. He began learning at a young age to numb and soothe himself by suppressing his emotions, including through the abuse of food. He had a major episode of depression at the age of 16, one consequence of which was that he abandoned his schooling. Fortunately, his high intellectual level allowed him to get back on an educational path and he was able to complete college and to excel in law school. He learned to suppress his depression to a low enough level that he could capably hide it from others. When Gene began his career at Apple in 2006, where he stated his job was "to bring a mess into order," this served a powerful psychological need in him. In a symbolic sense, he was able to use this professional role as a way to rebalance and repair some of his psychological wounds caused by the emotional chaos of his early life.

**SEC Response: Admitted that is what Dr. Barber said. Because it is an unverifiable opinion, it is not appropriate for a Local Rule 56.1 Statement of Facts, as courts "disregard all factual and legal arguments, opinions and any other portions of the 56.1 Statement which extend beyond statements of facts."** *Rouse v. Hudson County Department of Family Services,* **2019 WL 2083301, at \*1 n.1 (D.N.J. May 13, 2019).**

15. In 2010, however, Apple's top leadership changed—and so did its corporate culture.

**SEC Response: Admitted that Apple's top leadership changed. Admitted that Levoff said the corporate culture changed.**

16. As he recounted to Dr. Barber, it appeared to Levoff after the leadership change that "at least some of the high level executives [at Apple] were circumventing SEC regulations designed to thwart

4

insider trading" and were using Levoff "in his role as Director of Corporate Law to essentially 'put [his] seal of approval'" on their manipulative actions.

**SEC Response: Admitted that is what Dr. Barber reported Levoff said.**

17.  Levoff went along with this conduct for years, partly out of pressure and fear of being fired and partly to serve his need for "validation within the company."

**SEC Response: Admitted that is what Dr. Barber reported Levoff said.**

18.  But doing so made him "feel like garbage" and get the sense that he was losing "sight of his own moral compass" and trapped in a "slow and inexorable path into practicing 'flexible integrity.'"

**SEC Response: Admitted that is what Dr. Barber reported Levoff said.**

19.  Dr. Barber explained that Levoff's acquiescence to and tacit approval of what he believed to be market manipulation by a handful of wealthy executives contributed to him being overwhelmed by his mental disorders, which in turn led him—in a desperate act of self-sabotage—to engage in the offense conduct:

> As time went on, … Gene became increasingly demoralized by the company's culture, and found himself slipping into a pattern of catering to the preferences and demands of men in positions of power above him. This deepened his sense of shame and fed into the cycle of his depression, eating disorder, and social anxiety. Ultimately, he engaged in the conduct that brought about a self-created crisis, a consequence of which was that his hidden, internal sense of shame was publicly exposed. This is a common way in which people suffering with long-standing emotional trauma finally break open issues that have been previously suppressed and concealed, creating chronic psychological pressure and negatively affecting the person's quality of life.

**SEC Response: Admitted that is what Dr. Barber said.  Because it is an unverifiable opinion, it is not appropriate for a Local Rule 56.1 Statement of Facts, as courts "disregard all factual and legal arguments, opinions and any other portions of the 56.1 Statement which extend beyond statements of facts."  *Rouse v. Hudson County Department of Family Services,* 2019 WL 2083301, at *1 n.1 (D.N.J. May 13, 2019).**

20. As Levoff told Dr. Barber, "[h]e has come to realize that by trading Apple stock after himself announcing that the trading window was closed—doing something he had no need to do that was so obviously wrong and so easy to detect—he was at some level trying to get caught. He stated, 'This was an act of self-sabotage.'"

**SEC Response: Admitted that is what Dr. Barber reported Levoff said.**

21. Dr. Barber's findings help explain why a man of Levoff's intelligence would engage in conduct that was so contrary to his nature, so easily discoverable, and so devastating to his personal life and professional career, a point she made forcefully:

> The above findings may help to explain how a highly intelligent person could exercise such impaired judgment over a sustained period of time without including the intent to enrich himself simply to facilitate a more lavish lifestyle. It is important to highlight that an individual's general intelligence—the ability to learn and to apply knowledge in both verbal and non-verbal realms—is distinct from the function of judgment, which involves the capacity for self-awareness, the ability to objectively consider and weigh risks and rewards, and the ability to make decisions based on rational criteria informed by experience…. [A]ll human acts of judgment and decision-making can be impacted by strong emotional motivating factors, particularly if they are longstanding, not fully emerged into consciousness, and serve a compelling goal—which in Gene's case was a way to extricate himself from a deeply unfulfilling professional role. At the same time, through this conduct he also found a way to expose the internalized shame he had struggled with throughout his life.

**SEC Response: Admitted that is what Dr. Barber said. Because it is an unverifiable opinion, it is not appropriate for a Local Rule 56.1 Statement of Facts, as courts "disregard all factual and legal arguments, opinions and any other portions of the 56.1 Statement which extend beyond statements of facts."** *Rouse v. Hudson County Department of Family Services,* **2019 WL 2083301, at \*1 n.1 (D.N.J. May 13, 2019).**

22. Dr. Barber emphasized that while "[t]his background in no way absolves Gene of responsibility for his conduct," it "provides a context for understanding his actions and highlights the fact that he has suffered for many years with more than one mental health condition that adversely affected his self-regard and made him vulnerable to losing his way."

6

**SEC Response: Admitted that is what Dr. Barber said. Because it is an unverifiable opinion, it is not appropriate for a Local Rule 56.1 Statement of Facts, as courts "disregard all factual and legal arguments, opinions and any other portions of the 56.1 Statement which extend beyond statements of facts."** *Rouse v. Hudson County Department of Family Services,* **2019 WL 2083301, at \*1 n.1 (D.N.J. May 13, 2019).**

23. At Levoff's sentencing, the Court noted that it was "impressed" by Dr. Barber's "extensive and long analysis of Mr. Levoff."

    **SEC Response: Admitted.**

24. The Court concluded that there is "some credibility to what Dr. Barber suggests and what we all say is that he sabotaged himself for a lot of underlying mental health issues that began when he was in high school because he dropped out of high school for depression and mental health issues" and "he's been struggling with this throughout his adult life."

    **SEC Response: Admitted.**

25. Noting Dr. Barber's "extensive and long analysis of Mr. Levoff," the Court stated that it has gotten Dr. Barber's reports in the past, that to the Court's recollection it is not often she has actually made such a recommendation, and that this was "something that impressed the Court," (*id.* at 32:4-8), as did the USAO's agreement to a sentencing range of zero to 24 months.

    **SEC Response: Admitted.**

26. The Court also considered the Presentence Investigation Report ("PSR") prepared by the United States Probation Office (the "USPO").

    **SEC Response: Admitted.**

27. In the PSR, the USPO recommended a reduction for Levoff's acceptance of responsibility, finding that he "clearly demonstrated acceptance of responsibility for the offense" because, *inter alia,* he

7

provided a statement "wherein he affirmed the truthfulness of his plea allocution and guilt in the offense" and "expressed remorse for his action."

**SEC Response: Admitted.**

28. The USPO also recommended an additional adjustment for acceptance of responsibility because Levoff had "assisted authorities in the investigation or prosecution of [his] own misconduct by timely notifying authorities of the intention to enter a plea of guilty."

**SEC Response: Admitted.**

29. Finally, the USPO recommended that the Court not order Levoff to pay restitution "because the victim(s)'(s) losses are not ascertainable."

**SEC Response: Admitted.**

30. Ultimately, the Court rejected the Government's request to sentence Levoff to a term of imprisonment, and instead (1) sentenced him to a four-year term of probation (with six months of location monitoring); (2) ordered him to perform 2,000 hours of community service; (3) ordered treatment in a mental health program; (4) ordered forfeiture in the agreed amount of $604,000; and (5) imposed a fine of $30,000.

**SEC Response: Admitted.**

31. After stating, "I think we all agree the big issue here is . . . general deterrence," the Court found that this sentence and the "other considerable requirements" imposed by the Court, along with Levoff's loss of his ability to practice law and his prestige and position in society, were sufficient to satisfy its deterrence concerns.

**SEC Response: Admitted.**

32. At Levoff's sentencing, the Court found that a four-year term of probation with six months of location monitoring, 2,000 hours of community service, $604,000 in forfeiture, and a $30,000 fine was sufficient for purposes of deterrence.

**SEC Response: Admitted.**

33. In imposing the sentence it thoughtfully crafted, the Court concluded that the need for general deterrence was adequately served by the substantial adverse consequences resulting from Levoff's insider trading, which included not only his lengthy term of probation but also (i) the loss of his ability to practice law; (ii) the loss of his senior position at Apple; (iii) the destruction of his professional and personal reputations; (iv) the five-year process of his criminal prosecution, which was "emotionally and mentally very challenging;" and (v) the significant forfeiture he was ordered to pay.

**SEC Response: Admitted.**

34. In light of those consequences, the Court found that a custodial sentence was not necessary for deterrence purposes:

> I don't see that a custodial sentence will actually do any further deterrence. I can't imagine that somebody in a similar position would look at this and say, well this was not -- he didn't go to jail. Well, the sentence I am going to impose is going to impose considerable other requirements on him that are going to be substantial.

**SEC Response: Admitted.**

35. Soon after sentencing, Levoff paid the sum of $604,000 in full and complete satisfaction of the forfeiture money judgment.

**SEC Response: Admitted.**

36. The conduct to which Levoff pleaded guilty involved three discrete episodes of insider trading over a ten-month period, resulting in a total benefit to Levoff of $382,479: (1) four trades in mid-July 2015 that avoided losses of $345,459; (2) one trade in October 2015 that resulted in profits of $4,748; and (3) one trade in April 2016 that avoided losses of $32,272.

**SEC Response: Admitted.**

37. Levoff's violations did not involve hacking, theft of inside information or, as the Court repeatedly noted at sentencing, any efforts to conceal or disguise his conduct.

**SEC Response: Admitted.**

38. As the Court noted at sentencing, "[t]here's nothing in the record to show he was living excessively or high and therefore he did this for that extra money."

**SEC Response: Admitted.**

39. It is undisputed that Levoff made no effort whatsoever to conceal his insider-trading activities, a fact the Court noted repeatedly at sentencing.

**SEC Response: Disputed that Levoff made no effort to conceal his insider-trading activities. Levoff did not disclose his trading to anyone at Apple or to regulatory authorities.  *See* ECF No. 26, Levoff's Statement of Material Facts in Opposition to the SEC's Motion for Summary Judgment, at paragraphs 7-10.  Admitted that the Court commented as described at sentencing.**

40. The Court recognized that the unique sentencing range to which the Government agreed—zero to 24 months—was in part a reflection of the puzzling fact that Levoff did absolutely nothing to disguise his conduct:

> I've never seen a plea like this in an 11(c) where it says zero to 24 months. It might say 4 to 24 or 6 to 24, but somebody in your office also recognized what we're all struggling with here, and that was … but for this crazy conduct — which none of us can explain because he knew he was going to get caught. This was not an insider trading case where I've had where they do it in a different name, they do it in an alias or they do it with a relative. This was the guy who was supposed to be monitoring this stuff doing it.

**SEC Response: Admitted.**

B. **THE SEC'S LOCAL RULE 56.1 COUNTERSTATEMENT OF FACTS IN RESPONSE TO LEVOFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

1. On March 1, 2011, a trading blackout commenced for affected Apple employees. It lasted until after Apple's April 2011 earnings release.

**SUPPORT**: Exhibit 10 to the June 10, 2024 Declaration of Elizabeth R. Doisy ("Doisy Decl."), February 24, 2011 email from Gene Levoff to "Blackout_List."

10

2. On April 9, 2011, Levoff received nonpublic drafts of Apple's second quarter 2011 earnings disclosures.

**SUPPORT**: Exhibit 11 to the Doisy Decl., April 9, 2011 Disclosure Committee email distribution.

3. On April 7, 2011, Levoff wired in $100,000 to his TD Ameritrade Account. On April 8, 2011, he bought 360 Apple Shares for approximately $337 per share. On April 12, Levoff wired in $1.05 million to the same account. On April 13, he purchased 3,140 Apple shares for approximately $334 per share.

**SUPPORT**: Exhibit 12 to Doisy Decl., Levoff's April 2011 TD Ameritrade Account Statement for account X-5174.

4. At 4:30 PM on April 20, 2011, Apple disclosed record second quarter 2011 revenue. Approximately three hours later, Levoff sold 3,500 Apple Shares – the precise amount he had purchased on April 8 and 13 – for nearly $354 per share.

**SUPPORT**: Exhibit 12 to Doisy Decl., Levoff's April 2011 TD Ameritrade Account Statement for account X-5174; Exhibit 13 to the Doisy Decl., Business Wire Article Dated April 20, 2011.

5. On June 1, 2011, a trading blackout commenced for affected Apple employees. It lasted until after Apple's July 2011 earnings release.

**SUPPORT**: Exhibit 14 to the Doisy Decl., June 1, 2011 email from Gene Levoff to "Blackout_List."

6. On July 8, 2011, Levoff received nonpublic drafts of Apple third quarter 2011 earnings disclosures.

**SUPPORT**: Exhibit 15 to the Doisy Decl., July 8, 2011 Disclosure Committee email distribution.

7. Between July 11 and 19, 2011, Levoff bought a total of 3,336 Apple shares at prices between $354 and $375 per share.

11

**SUPPORT**: Exhibit 16 to the Doisy Decl., Levoff's July 2011 TD Ameritrade Account Statement for account X-5174.

8. On Tuesday, July 19 at 4:30 PM, Apple announced record third quarter earnings and revenue. Less than thirty minutes later, Levoff sold 3,336 Apple shares at just under $400 per share.

**SUPPORT**: Exhibit 16 to Doisy Decl., Levoff's July 2011 TD Ameritrade Account Statement for account X-5174; Exhibit 17 to the Doisy Decl., Business Wire Article Dated July 19, 2011.

9. On December 1, 2011, a trading blackout commenced for affected Apple employees. It lasted until after Apple's January 2012 earnings release.

**SUPPORT**: Exhibit 18 to the Doisy Decl., December 1, 2011 Tim Sheehan email to "Blackout_List."

10. On January 14, 2012, Levoff received nonpublic drafts of Apple first quarter 2012 earnings disclosures.

**SUPPORT**: Exhibit 19 to the Doisy Decl., January 14, 2012 Disclosure Committee email distribution.

11. Between January 20 and 24, 2012, Levoff purchased 1,578 Apple Shares at between $423 and $427 per share.

**SUPPORT**: Exhibit 20 to the Doisy Decl., Levoff's January 2012 TD Ameritrade Account Statement for account X-5174.

12. On January 24, 2012, Apple announced record first quarter revenue and profit. Less than 30 minutes later, Levoff sold 666 Apple shares at $454 per share.

**SUPPORT**: Exhibit 20 to the Doisy Decl., Levoff's January 2012 TD Ameritrade Account Statement for account X-5174; Exhibit 21 to the Doisy Decl., Business Wire Article Dated January 24, 2012.

Date:  June 10, 2024           <u>/s/ Daniel J. Maher</u>
Daniel J. Maher, Mass. Bar No. 654711
Securities and Exchange Commission
100 F Street, NE
Washington, D.C. 20549
Tel: (202) 551-4737
Fax: (202) 772-9292
Email: maherd@sec.gov