Kevin H. Marino
John D. Tortorella
John A. Boyle
MARINO, TORTORELLA & BOYLE, P.C.
437 Southern Boulevard
Chatham, New Jersey 07928-1488
Tel: (973) 824-9300
Fax: (973) 824-8425
*Counsel for Defendant*
*Gene Daniel Levoff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

-----------------------------------------------------x

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

               Plaintiff,

    v.

GENE DANIEL LEVOFF,

               Defendant.

-----------------------------------------------------x

Case No. 2:19-cv-05536-WJM-MAH

**CERTIFICATION OF KEVIN H. MARINO IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

*(Document filed electronically)*

KEVIN H. MARINO, of full age, hereby certifies, pursuant to 28 U.S.C. § 1746, as follows:

1.    I am an attorney at law of the State of New Jersey and a member of the law firm of Marino, Tortorella & Boyle, P.C., which represents Defendant, Gene Daniel Levoff ("Levoff"), in this action. I am fully familiar with the facts set forth in this Certification, which I submit in (i) opposition to the motion for summary

1

judgment of Plaintiff, United States Securities and Exchange Commission; and (ii) support of Levoff's cross-motion for summary judgment.

2.      Attached to this Certification as Exhibit A is a true and correct copy of the transcript of Levoff's sentencing on December 7, 2023, in *United States v. Gene Levoff*, Criminal No. 2:19-cr-00780-WJM (the "Criminal Action").

3.      Attached to this Certification as Exhibit B is a true and correct copy of the Indictment, dated October 24, 2019, in the Criminal Action.

4.      Attached to this Certification as Exhibit C is a true and correct copy of the transcript of Levoff's plea hearing on June 30, 2022, in the Criminal Action.

5.      Attached to this Certification as Exhibit D is a true and correct copy of the Presentence Report, dated November 9, 2023, in the Criminal Action.

6.      Attached to this Certification as Exhibit E is a true and correct copy of the Satisfaction of Judgment, dated December 22, 2023, in the Criminal Action.

7.      Attached to this Certification as Exhibit F is a true and correct copy of the report of Dr. Catherine Barber dated March 14, 2023.

8.      Attached to this Certification as Exhibit G is a true and correct copy of the report of Dr. Catherine Barber dated November 8, 2023.

I certify under penalty of perjury, pursuant to 28 U.S.C. § 1746(2), that the foregoing is true and correct.

Dated: June 3, 2024

Kevin H. Marino
MARINO, TORTORELLA & BOYLE, P.C.
437 Southern Boulevard
Chatham, New Jersey 07928-1488
(973) 824-9300
*Attorneys for Defendant*
*Gene Daniel Levoff*

# EXHIBIT A

```
 1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW JERSEY
 2   _____

 3   UNITED STATES OF AMERICA,        CRIMINAL ACTION NUMBER:

 4                                       2:19-cr-00780
     vs.
 5                                       SENTENCING
     GENE LEVOFF,
 6
             Defendant(s).
 7   _____
     MARTIN LUTHER KING BUILDING & U.S. COURTHOUSE
 8   50 Walnut Street, Newark, New Jersey  07101
     December 7, 2023
 9   Commencing at 1:31 p.m.

10   B E F O R E:    THE HONORABLE WILLIAM J. MARTINI,
                     UNITED STATES DISTRICT JUDGE,
11

12   A P P E A R A N C E S:

13   OFFICE OF THE UNITED STATES ATTORNEY
     BY:  JOSHUA L. HABER, ASSISTANT UNITED STATES ATTORNEY
14   970 Broad Street
     Newark, New Jersey 07102
15   For the Plaintiff

16
     MARINO TORTORELLA & BOYLE, P.C.
17   BY: KEVIN H. MARINO, ESQUIRE
         JOHN D. TORTORELLA, ESQUIRE
18       JOHN A. BOYLE, ESQUIRE
     437 Southern Boulevard
19   Chatham, New Jersey 07928
     For the Defendant
20
     A L S O   P R E S E N T:
21   GENE LEVOFF, Defendant
     CHRISTOPHER FAVAZZA, U.S. PROBATION OFFICER
22
                 Diane DiTizii, Official Court Reporter
23                   diane_ditizii@njd.uscourts.gov
                          (973) 776-7738
24
     Proceedings recorded by mechanical stenography; transcript
25         produced by computer-aided transcription
```

1    (PROCEEDINGS held in open court before the Honorable WILLIAM J.

2    MARTINI, United States District Court Judge, at 1:31 P.M.)

3              THE COURT CLERK:  All rise.

4              THE COURT:  Be seated.  Thank you.  Good afternoon.

5              All right.  Everyone be seated, please.

6              This is on the matter of United States of America

7    versus Gene Levoff.

8              Can I have the appearance of counsel, please.

9              MR. HABER:  Good afternoon, Your Honor.  Joshua

10   Haber, Assistant United States Attorney, for the government.

11             THE COURT:  Good afternoon.  Thank you.

12             MR. MARINO:  Good afternoon, Your Honor.  Kevin

13   Marino, Marino Tortorella & Boyle, for the defendant Gene

14   Levoff.

15             With me at counsel table is my partner, John

16   Tortorella, and in the first row my partner John Boyle.

17             Also, Your Honor, Dr. Catherine Barber, who made a

18   submission to Your Honor, is in the courtroom as well.

19             THE COURT:  All right.  Welcome to all of you and

20   good afternoon.  Mr. Levoff is here, of course.

21             All right.  We're here for the sentencing of

22   Mr. Levoff.

23             First of all, let me make sure everybody has received

24   a copy of the presentence report.

25             For the government, you received a copy of it,

1    correct?

2            MR. HABER:  Yes, Judge.

3            THE COURT:  And Mr. Marino, you received a copy of

4    the presentence report?

5            MR. MARINO:  Yes, we did, Your Honor.

6            THE COURT:  Do you have any new objections or

7    exceptions to it?

8            MR. MARINO:  I do not, Your Honor.

9            THE COURT:  And, of course, the Court has received

10   that and gone over it thoroughly.

11           In addition to that, I received from defense counsel

12   Mr. Marino a very extensive and thorough memorandum of

13   sentencing, along with a number of submissions which I've read,

14   including the report from Dr. Barber, I think it was, which I

15   have gone over thoroughly.

16           I assume the government's gotten a copy of that as

17   well, correct?

18           MR. HABER:  Yes.  Thank you.

19           THE COURT:  Okay.  And I also received from the

20   government their sentencing memorandum dated November 22nd,

21   which, of course, I've gone over thoroughly.

22           The presentence report, the guideline analysis there

23   comes up with a Total Offense Level of 17 and Criminal History

24   Category of 1.

25           Does anybody disagree with that as a guideline

1    analysis?

2              MR. HABER:  No objection.

3              MR. MARINO:  We do not, Your Honor.

4              THE COURT:  You could remain seated and just pull the

5    microphones closer to you and just speak right into the

6    microphone.  That would be easier.

7              All right.  The defendant pled guilty to six counts,

8    Count 1, 2, 3, 4, 5 and 6.  Basically in summary, securities

9    fraud.  He was arrested on February 20th, 2019 and released at

10   that time on a $500,000 secured appearance bond and he's been

11   out since that date.

12             As I just indicated, there's no prior criminal

13   history and the guideline would recommend the sentencing of 24

14   to 30 months to run concurrently; however, the parties have

15   entered into a Rule 11 (c)(1)(C) agreement in which they've

16   agreed that the range of sentencing can be anywhere from zero

17   to 20 months.

18             Everyone agrees with my statements up to this point?

19             MR. HABER:  Yes, Your Honor.

20             THE COURT:  Just a moment.

21             With those opening remarks, let me hear from you,

22   Mr. Marino, first, and -- here it is, okay.  You could come

23   forward, if you wish.

24             MR. MARINO:  Thank you very much, Your Honor.

25             First, Your Honor, let me thank you for the attention

1    that I know you've paid to this matter.  We made our submission

2    in advance of the originally scheduled sentencing date and at

3    the Court's instance, the sentencing date was moved to give

4    Your Honor the opportunity to review those materials.  And I'll

5    tell you, it's tremendously significant to us, not surprising,

6    but very much appreciated.  It's always comforting to know that

7    the court is paying the kind of attention that this Court has

8    been paying to this -- to this sentencing and to this case as a

9    whole.  So we appreciate that very much.

10              THE COURT:  You're welcome.

11              MR. MARINO:  Your Honor, I, in many years of having

12    the privilege and the pleasure of representing individuals

13    accused of crimes, I don't believe I've ever come across

14    someone quite like Gene Levoff.  You've got the benefit not

15    only of Dr. Barber's two reports that Your Honor averted to a

16    moment ago, but also more than two dozen additional letters

17    from people who really know and have interacted with and

18    experienced the person that Gene Levoff is throughout the

19    course of his lifetime.

20              And we've all seen situations where, for example,

21    someone who's in public life, celebrity or a public figure, a

22    politician, it's not too difficult for those folks to garner

23    quite a bit of support in the form of letters.  It seems

24    someone's always ready to line up and write a letter to support

25    someone who's a public figure, a celebrity.

1        Gene Levoff is neither of those but he is an

2    individual who has in his everyday life, for the entire

3    duration of that life, conducted himself in the way that we

4    hope our children will conduct themselves, we hope that our

5    closest colleagues and friends will conduct themselves, we hope

6    we ourselves are able to conduct ourselves.

7        The letters are pretty extraordinary.  Your Honor's

8    been doing this for a long time.  You see a lot of letters.

9    I've seen quite a few letters also, but I don't think I've ever

10   seen anything like the letters that describe this truly decent,

11   truly intentional-living good person who has overcome a raft of

12   mental and emotional problems that bring us here today.

13       In white collar cases, it's very, very unusual to

14   find someone who is -- who has committed an offense that was

15   not motivated by greed.  I think it's very clear that

16   Mr. Levoff's offense was not greed-driven.  I think it's -- and

17   Your Honor has the benefit of this.  I won't regurgitate

18   everything that Dr. Barber has said, but what has struck me

19   throughout from the moment that I met him, which was quite a

20   long time ago, the intercession of the pandemic of course

21   contributed to that.  This is a case that's been pending

22   literally for five plus years, but it's -- it's really

23   something the extent to which Mr. Levoff has used this very

24   significant bump in the road of his life, this aberrational

25   behavior, to change entirely who he is in terms of outlook.

1  He's always been a person who's been incredibly decent and
2  incredibly thoughtful and caring person, but as you see from
3  Dr. Barber's report, someone who was troubled -- very troubled
4  from a very early age.
5        You know, he was -- he was a person who couldn't
6  figure out how to get out of a very unpleasant situation
7  working at Apple.  A situation that had become untenable for
8  him, but he was torn.  He certainly didn't want to disappoint
9  his parents and disappoint all those who sacrificed for him.
10 Man born in Russia, came to this country as a young man.  And
11 the very difficult childhood and adolescence and young
12 adulthood that he experienced, which is detailed in the letters
13 that Your Honor has received, really set him on a path that at
14 the end of the day led him to the outwardly apparently
15 tremendously successful but inwardly incredibly tortured and
16 tormented and troubled.
17        So here we are.  Gene Levoff has committed the
18 offense of insider training and done it in a way that is not
19 like any other insider trading case I have ever seen.  It is
20 not a situation where, to be quite honest, this amount of money
21 was significant to Gene Levoff.  In the course of his lifetime
22 as a corporate secretary at Apple and someone who is quite a
23 senior executive there, someone who is relied upon to give
24 legal advice to that enormously successful company.  He made a
25 lot of money and had a lot of money.  And I think it's pretty

```
 1    clear from Dr. Barber's report that she shares this view and

 2    she's diagnosed him with four separate disorders.

 3              The heart of this is, this is not a person who

 4    thought, Let me figure out a way to grab a few dollars from

 5    Apple.  It was more a person who said, Let me figure out a way

 6    to get the hell out of here.

 7              THE COURT:  Well, I mean, I know that's your argument

 8    but there's another way to get out.  Just resign.

 9              MR. MARINO:  Well, for you and me, that might be

10    easier for you to do.

11              THE COURT:  I mean, I know that -- I don't mean to --

12    but I'm just saying when you say that was his motivation, to

13    break the law to get out of Apple.

14              MR. MARINO:  Well, that's hardly clear thinking,

15    right, Your Honor?

16              THE COURT:  I mean, yes, consistent with what you're

17    saying, as far as I know -- and I think, Mr. Haber, are you

18    there?

19              MR. HABER:  Yes, Your Honor.

20              THE COURT:  I know you're there.

21              I don't think there was anything on his behalf to try

22    to conceal what he was doing.

23              MR. MARINO:  Zero.

24              THE COURT:  He did it in his own name.

25              MR. MARINO:  Judge, this is a man who, as you're
```

1    saying, he's setting the window, right, at which one can buy

2    and sell.  He was restricted from buying and selling, and then

3    in his own name makes these trades during that period.

4            Dr. Barber tells us that's a cry for help.  You and I

5    can easily say, Hey, we don't like our job, we're leaving.

6    We're not going to stick around in a job we don't like.  We

7    know how to get out.  We quit.

8            But what we've learned about Gene Levoff's psyche --

9    and I'm not suggesting and haven't suggested this is something

10   that would rise to the level of a diminished capacity defense.

11   That's not what I'm driving at.  What it's really focused on --

12   and I think Your Honor can appreciate this -- is trying to

13   steer you or lead you to a resolution of this most difficult

14   case that takes account of the unique nature of this particular

15   offender and this particular offense.

16           So sure, we can say, Oh, he didn't like the job, we

17   just quit it.  We didn't like what we were being asked to do,

18   we just quit.  We didn't like the position that had been

19   assigned to us or the things that we were expected to do for

20   the Apple executives.  We didn't like that.  It didn't jive

21   with our own sense of propriety, appropriateness, honesty, what

22   have you.

23           But for someone like Gene Levoff, this was the path

24   out.  Not for myself, not for Your Honor, not for many people,

25   but Mr. Levoff is not many people and the circumstances in

1    which he found himself and his own unique psychological

2    difficulties, I would suggest to Your Honor tells a great deal

3    about why this would happen.

4           You know, when I first had this case -- and there

5    have been, well, a litany of prosecutors over the years that

6    have handled it because it's gone on for so long.  It's been

7    passed from one to the other.  But early on, you know, I found

8    myself saying to one of Mr. Haber's predecessors, you know,

9    when a case is this easy for you, maybe that's the moment to

10   take an extra hard look at it and ask yourself, why?  Why is it

11   this easy?  Why is someone who graduated from Stanford Law

12   School and was universally revered by his colleagues and

13   friends, beloved, respected, someone to turn to in a pinch, why

14   is he committing a crime that is -- as Your Honor has said --

15   no attempt whatsoever to conceal it.  No attempt whatsoever.

16          And why is that important?  It's important because

17   when you make an attempt to conceal, you're underscoring the

18   nature of your intent to do wrong.  I'm not suggesting that

19   Mr. Levoff lacked the intent to commit the crime.  If he did,

20   we wouldn't be here.  We would have tried this case in this

21   courtroom.

22          What I'm suggesting is it really does give us insight

23   into what's going on.

24          The reason I think back in 2007, the Supreme Court

25   said after 20 years of the federal sentencing guidelines being

1  mandatory, these guidelines have to be advisory because as

2  mandatory guidelines, however much they did to lead to some

3  perceived notion of consistency in sentencing, they took away

4  the fundamental discretion that the judge has.

5        Now, we're before Your Honor with a sentencing plea

6  that enables you to sentence this individual anywhere from zero

7  to 24 months.  Gene Levoff has, during the period of time that

8  this case has been pending, has done nothing but go out and try

9  to better himself and those around him.  He has done nothing

10  but try to, in some way, demonstrate his substantial remorse

11  for where he found himself and what he has done.  So that has

12  taken the shape of myriad forms of community service.  Not

13  community service because I hope this will make the judge think

14  well of me.  He didn't go to see Dr. Barber as -- as his

15  therapist because he thought that might help him with Judge

16  Martini.

17        What happened here was Dr. Barber happens to be a

18  person who has been appointed by any number of your colleagues

19  over the years.  My thought in bringing Dr. Barber into the

20  matter is this simple:  I don't want to go out and hire an

21  expert to say good things about Gene.  What will they be able

22  to say about his diminished capacity?  What will they be able

23  to say that will curry favor with the court?  What I wanted

24  from Dr. Barber and what I got from Dr. Barber was the truth.

25  I just want credibility.  I want to help this guy.

1    For almost everybody, an offense of this type would

2 be the devastating event that ends it for you.  For Gene

3 Levoff, it was the devastating event that gave him new life;

4 that taught him what he actually could be; that enabled him to

5 look inside himself and see the beauty that all these people

6 that are writing about him saw.

7    I mean, I will tell you, these letters, I read them

8 in one fell swoop.  I collected them and read them and I was

9 moved to tears by these letters because I've never seen -- I've

10 never seen letters that so uniformly reflect a single thread

11 about an individual.  The thread about Gene Levoff is if you

12 need something, he is there for you.

13    Gene Levoff has lived the principle of we all are

14 here responsible to walk one another home.  He's lived that.

15 That's who Gene Levoff is.  Gene Levoff has spent his entire

16 life, first for years and years and years struggling after a

17 very difficult, onerous upbringing, all of which is detailed in

18 the materials that Your Honor has, but in the last five years

19 on nothing short of a -- an absolute committed odyssey to get

20 to the bottom of his problems and to resolve them.

21    Gene Levoff would like nothing more than to continue

22 doing the kind of community service that he's done.  There's no

23 amount of community service that Your Honor could impose upon

24 Gene Levoff that he would not be enormously grateful for.  He

25 is a person who has internalized the idea that has animated

1  thinking for years and years going back to St. Augustine and

2  through the rule of Benedict that a prayer is work.

3       He is someone who told me without any -- without the

4  slightest hint of irony that hauling fifty-pound bags of

5  potatoes is something that he could literally do and be

6  fulfilled by.  That's the extent to which he understands this

7  is a moment when I can do things for people.  This is what's

8  good for me.

9       He's not someone who's trying to take care of himself

10  or get what's best for him.  He's volunteered to go to Ukraine.

11  You know, he's a Russian immigrant.  Volunteered to go there in

12  the worst period in history in that part of the world to be of

13  service.

14       So yeah, committing a crime like this, it's

15  frustrating.  It's been frustrating for me.  It was frustrating

16  for me from the day I met Gene Levoff, flew into Newark Airport

17  from California and we spent time, hours together that day.

18  It's been frustrating to me from that day to this because this

19  is so obviously not your typical criminal case.  It's so

20  obviously not the typical criminal defendant.  I would be

21  thrilled for someone to say about myself, or any of my loved

22  ones, the things people have said about this man.

23       So here's where we find ourselves.  Your Honor could

24  sentence Gene Levoff to a sentence of incarceration.  I think

25  it would derail him.  I think it would derail all the progress

1    that he has made, but most importantly, I think it wouldn't fit

2    his unique crime.

3           And this is the problem:  If computer adjudication

4    worked, you could say tell me exactly how much did he do?  And

5    what was the specific offense?  And where's the statute?

6           And just put it in the computer, here's what he gets.

7    For years, between beginning on November 1st, 1987 and ending

8    with *Kimbrough* back in 2007, that's what we basically had.

9    We've got to find a way to get a variance.  We had to find a

10    way to get a departure from the guidelines.  Some way to

11    restore the Article 3 judge's discretion, that is the stock and

12    trade of the Article 3, Judge.

13           Now we're in a different case and this is a case that

14    tested to the maximum.  What this case says from my perspective

15    is do we really -- have we really gotten to the place where we

16    can look at an offender like Gene Levoff and understand and

17    truly appreciate where he came from.  Truly appreciate how he

18    got here and think about what's going to be the best for all

19    concerns.

20           Now, I will admit to Your Honor, I struggle at times

21    to know why insider trading is a crime.  I'll be candid with

22    you.  I could cite to you a hundred articles from the most

23    learned folks in the world telling you why it shouldn't be a

24    crime.  Why those -- the idea of material, nonpublic

25    information out there is part of the deal.

1          THE COURT:  I wouldn't go there.

2          MR. MARINO:  I know where you are because we made

3   this motion and you shut it down, right?

4          THE COURT:  I mean, it's a pretty obvious reason why

5   it's a crime.

6          MR. MARINO:  Well, it's obvious if you have a lot of

7   faith in the rest of what's going on in that system, right?  So

8   that's for another day, but let's be honest --

9          THE COURT:  I don't know who's writing these articles

10  as to why it's not a big deal or why it shouldn't be a crime.

11         MR. MARINO:  Judge, how many of these people that are

12  out there and dealing in securities --

13         THE COURT:  That's why -- wait, wait, wait.  That's

14  why there's a certain need to deter.

15         MR. MARINO:  I got that.

16         THE COURT:  I'm not sure you did.  I mean, that's the

17  whole -- you know, contrary to what you're saying, the whole

18  purpose is to deter others who are in similar positions that

19  have the opportunity to inside trade.

20         MR. MARINO:  May I ask the Court a question?

21         THE COURT:  Go ahead.

22         MR. MARINO:  How much deterrence do you think is

23  required for someone to get this message?  If you're the guy

24  that has to tell folks when to trade and not to trade, don't

25  trade insider trading, don't do that in your own name in

1  open -- you know, this isn't the kind of offense that you need

2  to deter.  This is wacky what he did.  It's not straight up.

3  It's not something a rational person would do.

4        You know, I was thinking about, in doing insider

5  trading, a person might say, in exactly the way Gene Levoff did

6  it but because he was -- I'm deterred because he got some sort

7  of draconian sentence.  That doesn't make a lot of sense when

8  you think about the categorically imperative.

9        What I'm talking about is take a good hard look at

10  this guy.  He did something that one does when they are not in

11  their right mind.  Does it mean that he's passed the McNaughton

12  test and he couldn't appreciate the wrongfulness of his

13  conduct?  No.  That's not what we're suggesting and Your Honor

14  knows this.

15        But what does it say about him and what would be the

16  best way -- what would be the most significant way to take this

17  situation and turn it to a positive?  I suggest to Your Honor

18  that if you have someone who's lived the unique life experience

19  that Gene Levoff has and suffer from the diagnosed condition

20  that Gene Levoff has, think about what you need to do to deter

21  that person.  But the deterrence argument, it really falls

22  short when you begin to consider the unique circumstances of

23  this individual.

24        Gene Levoff wants to do good things with the rest of

25  his life.  I have not been involved in any cases where a

1    treating physician or a treating psychologist overly and

2    expressly implores the Court to impose a noncustodial sentence.

3    I think that's unusual in my experience and I think it's

4    unusual because at the end of the day, you rarely find someone

5    in this unique circumstance.

6         And I will tell you, I get it.  I get completely the

7    need to deter, the need to punish, the need for rehabilitation.

8    Nobody has been punished more than Gene Levoff, possibly

9    punished over the course of the past five years.  And to be

10   candid, from a deterrence perspective, who in seeing his public

11   humiliation, who in seeing this person lost everything he had,

12   his standing in the community, his ability to practice law,

13   everything that he worked so hard.  The esteem of his friends

14   and family members.  All of those things, you look at that and

15   say, man, if that's not enough to deter me from doing what he

16   did at a time when he had no need to do it, he had plenty of

17   money.

18        So, Your Honor, I've had the pleasure of being before

19   this Court on a few occasions.  I think I have some familiarity

20   with what a practical, common sense but very thoughtful Court

21   I'm appearing before, and perhaps I make different arguments in

22   front of different judges, but I know how Your Honor sees this

23   sort of thing.  I know the commitment you have to the rule of

24   law.  Nothing gets advanced, nothing, by Gene Levoff getting a

25   custodial sentence.

1          What he would like is send him to Ukraine.  Give him

2     hundreds of hours of community service, which he would do

3     gleefully.

4          These letters beginning with the Barber reports and

5     going through all the rest, they really do say it all, Your

6     Honor.

7          I don't want to belabor it.  I appreciate you

8     allowing me to go on at a bit of length.  I think you can see I

9     have some considerable emotional commitment to it.  I think we

10    as lawyers, we really do have an enormous privilege and with

11    it, like with all privileges, comes an enormous responsibility.

12    I have enormous responsibility of taking Gene Levoff's problems

13    off his shoulders, to the extent I could, and put them on my

14    shoulders and the shoulders of my partners, and try to really

15    present him first to the United States Attorney's Office and

16    then to this Court in a way that would enable you to see who

17    we're really dealing with here.

18         Judge, this is a really good person who did a really

19    foolish thing; who suffers from four diagnosed illnesses and

20    who has completely transformed his life.  And what I'm asking

21    you to do is to give him a chance to continue that work.  Send

22    him off to do community service.  Let him do the sort of things

23    that are set forth in these letters.  I know you've read them

24    and I know how impactful they are.  So that's my -- that's my

25    plea to Your Honor.

```
 1              I appreciate very much the opportunity to make these
 2    remarks.
 3              THE COURT:  Thank you, Mr. Marino.
 4              MR. MARINO:  Thank you, sir.
 5              THE COURT:  Thank you very much.
 6              Mr. Levoff, do you wish to address the Court?  You
 7    can do it from there.  Just use the microphone and speak up,
 8    please.
 9              You could remain seated.  It's okay.  If you're more
10    comfortable standing, go ahead but you can remain seated.
11              THE DEFENDANT:  Thank you, Your Honor.
12              I just want to say how very sorry I am, how -- how
13    deeply ashamed I am.  And I also want to thank everybody who's
14    been involved in this process for how very decent and
15    professional they've been to me from the very beginning and
16    that's probably more than I deserve.
17              Thank you, Your Honor.
18              THE COURT:  All right.  Mr. Haber, do you wish to
19    address the Court?
20              MR. HABER:  Yes, please.
21              THE COURT:  If you want to step forward at the
22    podium, go ahead, or do it right from your seat.
23              MR. HABER:  I'll stay here, Your Honor, if that's
24    okay.  Thank you.
25              Your Honor, much of our arguments are in our
```

United States District Court
Newark, New Jersey

```
 1    sentencing submission.  I'll try not to repeat myself too much.

 2              THE COURT:  I do have a question.

 3              MR. HABER:  Yes.

 4              THE COURT:  I should have asked Mr. Marino.

 5              MR. MARINO:  I'm available, Your Honor.

 6              THE COURT:  I know you are.  Is there any issue of

 7    forfeiture here?

 8              MR. HABER:  There is, Your Honor.  There is -- I

 9    believe my office submitted a forfeiture order.  If I'm

10    mistaken about that, we will submit one immediately after

11    sentencing.

12              THE COURT:  Keith, do we have a forfeiture order?

13              THE COURT CLERK:  I have nothing on the docket

14    currently.

15              MR. MARINO:  We do, Your Honor.

16              THE COURT:  When you say you have a forfeiture order,

17    what is that?  $604,000?

18              MR. HABER:  That's correct, Your Honor.

19              MR. MARINO:  Correct.

20              THE COURT:  And it's an order that Mr. Levoff has

21    agreed.

22              MR. MARINO:  That is correct, Your Honor.

23              MR. HABER:  Yes.

24              THE COURT:  But Mr. Marino, has he made any payments

25    towards this forfeiture?
```

United States District Court
Newark, New Jersey

```
 1            MR. MARINO:  He has made it clear he'll make the

 2   payment the moment it's requested.

 3            THE COURT:  Well, you know, I just saw this in the

 4   presentence report.  I'm saying to myself why hasn't any

 5   payments been made.  He certainly has a net worth that can

 6   easily pay the whole sum.

 7            MR. MARINO:  I can assure Your Honor that Mr. Levoff

 8   would have paid it the moment that he enters plea.  It's not --

 9   there's no doubt.

10            THE COURT:  Why didn't he?

11            MR. MARINO:  That's not how it works.

12            THE COURT:  It does work that way.  I've had cases

13   where the defendant doesn't dispute the amount in the

14   forfeiture order, and in good faith they come at sentencing and

15   it's already been paid or satisfied, or a part of it has been.

16            MR. MARINO:  You know, Your Honor, I will tell you

17   this:  It's not from any strategic motive to try to hold on to

18   the money.  I made clear to them that he's prepared to pay it.

19            THE COURT:  Well, after he's sentenced, who knows

20   what his motivation will be as to whether he's going to pay it.

21            MR. MARINO:  Let me say it this way, Your Honor:

22   Mr. Levoff --

23            THE COURT:  You can't represent for him.  You can't

24   speak on behalf -- no lawyer can say on behalf of their client

25   he's gonna do it tomorrow.  You're not going to say --
```

United States District Court
Newark, New Jersey

```
1              MR. MARINO:  Should I have him say it?

2              THE COURT:  You know better than that.

3              MR. MARINO:  He'll pay it with interest tomorrow.  I

4    don't mean to suggest that we're off on a --

5              THE COURT:  That was a glaring thing.  You know, I

6    read this report and I see his net worth is very substantial

7    and his loss and gain from this was $604,000.  I would have

8    thought that a big payment at least would have been made

9    towards it before sentencing.

10             MR. MARINO:  If I thought that would have advanced

11   the ball, he would have paid it day one.  It wasn't strategic.

12   They never suggested that.

13             THE COURT:  I know, but if you were sitting as the

14   judge, you see that and you go, Gee, this guy is really trying

15   to correct the wrong, and he could have done it a year ago.

16             MR. MARINO:  He could have done it five years ago.

17   That's on me, Your Honor.  I had no idea.

18             I can tell you as an officer of the court, and this I

19   can say to you, he was prepared to pay it immediately.  He's

20   never suggested for a moment --

21             THE COURT:  Can he write a check right now?

22             MR. MARINO:  He can.

23             THE COURT:  Okay.  You heard that, Mr. Haber.  You'll

24   collect a check tomorrow.  Correct?

25             MR. MARINO:  Yes, you can collect the check later
```

United States District Court
Newark, New Jersey

```
 1   today.
 2              THE COURT:  Mr. Levoff, did you hear this?
 3              THE DEFENDANT:  Your Honor, I'll gladly do that.
 4              THE COURT:  Do you?  I mean, if you're going to make
 5   representations in court today, be careful because if you can't
 6   do it or you don't want to do it, that's a factor, you know.
 7              THE DEFENDANT:  Your Honor, I'm absolutely ready to
 8   do that at any time and have been all along.
 9              THE COURT:  Well, then, somewhere along the line you
10   forgot or somebody forgot.  But, you know, from a judge's point
11   of view, when you see a loss, it's rare that -- it's not often
12   that the defendant has the ability to pay it all at once.  You
13   know, that doesn't happen too often.  So you sign a forfeiture
14   order and you hope that the person will make payments towards
15   it.  A lot of times they don't even fulfill the forfeiture
16   order.  I see that all the time.  But in this case, I saw the
17   financials here and I'm saying, gee, what's going on.
18              MR. MARINO:  I can say, Your Honor, that Mr. Levoff
19   will make the payment irrespective of what sentence Your Honor
20   imposes and we'll do it tomorrow.
21              THE COURT:  Okay.  Well, you're on the record, you
22   can't promise that he'll do it.  He could promise.  He did, he
23   did.  I don't even think it's a big deal considering his net
24   worth.
25              THE DEFENDANT:  Your Honor, I will gladly do this
```

1    immediately.

2         THE COURT:  Okay.  I just thought we should bring it

3    up.

4         Go ahead, Mr. Haber.

5         MR. HABER:  Thank you, Your Honor.

6         I think a lot of the arguments that defense counsel

7    just made to Your Honor are already reflected in the plea

8    agreement that was entered into between the parties.  As we've

9    all discussed, the guideline range here is 24 to 30 months and

10   yet the parties entered into an agreement with a range of zero

11   to 24 months, and I think many of the arguments that --

12        THE COURT:  Zero to 20.

13        MR. HABER:  24 months.

14        THE COURT:  Is it 24?  Zero to 24.

15        MR. HABER:  Zero to 24.

16        THE COURT:  Oh, I thought it was zero to 20.  Okay.

17   I have to look at it again.

18        MR. HABER:  I believe that agreement reflects many of

19   the arguments that Mr. Marino made to this Court.

20        One of the things that came up during the defense

21   counsel's presentation, Mr. Marino's presentation, is the idea

22   that insider trading perhaps is not a serious crime, and I

23   think, as this Court has already acknowledged, insider trading

24   calls into question the integrity of the American financial

25   market.

```
 1              THE COURT:  He backed off on that though.  He backed
 2    off on that.
 3              MR. HABER:  But I think it really is important to
 4    note not only does it call into question the integrity of the
 5    markets, but it is also a relatively easy crime to commit.
 6    It's a crime of convenience and it's a very hard crime to
 7    investigate and prove up, which is why in these cases
 8    deterrence is so important and which is why ultimately we do
 9    think that a meaningful term of imprisonment is appropriate
10    here.
11              And I will circle back to deterrence shortly but in
12    terms of the nature of circumstances of this offense, and I
13    won't get into the nitty-gritty details of the defendant's
14    conduct, but it was egregious and it lasted over years.  He was
15    a high-ranking executive within Apple, one of the most elite
16    companies in the world, and over years had access to inside
17    information which he traded on for profit over and over again.
18              And exacerbating the crime was that he was in a
19    position to, in fact, enforce these rules internally within
20    Apple that precluded people from trading during blackout
21    periods and violating insider trading laws and yet he himself
22    was doing it.
23              So there's no question that on the spectrum of
24    insider trading cases and insider trading conduct, this was
25    truly egregious conduct.
```

```
1            In terms of the defendant's history and

2    characteristics, Your Honor, the government takes at face value

3    Mr. Marino's representations about everything that Mr. Levoff

4    has done since being arrested and since being charged to deal

5    with some of his issues, and we commend him for that and for

6    the steps he has taken to change and, of course, correct his

7    life.  But ultimately, many of the issues that are outlined in

8    Dr. Barber's report and that Mr. Marino focused on are,

9    unfortunately, not particularly extraordinary and not

10   particularly surprising when you look at defendants that come

11   before this court and, frankly, when we look at the population

12   at large.

13           And, yes, every individual has their own history, has

14   their own degree of severity when they're dealing with mental

15   health issues, such as anxiety and depression, but according to

16   the American Bar Association, which I looked up before

17   sentencing today, they cite statistics that say approximately

18   ten percent of Americans deal with depression and that there

19   are also studies that suggest that depression and anxiety are

20   even more prevalent among lawyers.  And, anecdotally, I'm sure

21   we all know lawyers within our profession who have extremely

22   high-stress jobs at major companies, at firms, and deal with

23   mental health issues all the time.

24           Stating the obvious, the vast majority of those

25   people don't resort to serious felony criminal activity as a
```

1    way to get out of that stress, out of that anxiety.

2            And while Mr. Levoff's mental health issues are

3    serious, although, unfortunately, not exceptional for people

4    that come before this Court, what does make Mr. Levoff unique

5    of course is that he had the tremendous resources, education,

6    opportunities to get help through other means unlike many other

7    defendants that come before this Court.  But instead of taking

8    that path, he, among other things, chose the path of committing

9    serious crimes over a long period of time.

10           The one thing I also wanted to address was this

11   question of whether this was a greed-driven crime.

12           THE COURT:  Mr. Haber, when you say --

13           MR. HABER:  Yes.

14           THE COURT:  With respect to Counts 1 through 6, it

15   started July 17, 2015.  One two, three, four -- four counts

16   were all July 2015 and then October of 2015, and then April

17   2016.  I mean, those were the six counts, correct?

18           MR. HABER:  Yes, Your Honor.  I believe the conduct

19   began as early as July of 2011.

20           MR. MARINO:  That's just inaccurate.

21           THE COURT:  Yeah, I mean.  The one he pled to started

22   in July of 2015.  Four counts were in July of 2015, one count

23   in October, and then another one in 2016, April.  Those are the

24   dates of the six counts.  That's all I'm saying.

25           Now, I don't know whether the conduct began before

```
1    that or after that.  Continued, I don't know.  But when you say
2    long, you know, I mean, that's a period of time.
3              MR. HABER:  Even if we were to cabinet it in that
4    period of time, it's still not a one-off, Your Honor, right?
5    It's not a single act of desperation.  It's not a single act of
6    a mistake.  It's not even two acts of desperation or mistake.
7    It is deliberate conduct over and over again and again, even if
8    we were to cabinet it to that period of time.
9              THE COURT:  Okay.
10             MR. HABER:  The point I was trying to make about
11   Mr. Levoff's mental health issues, which we certainly do not
12   take lightly, is that I don't think that that is the only thing
13   that the Court can look to as to what was driving this.
14   Mr. Marino argued that this was not a crime of greed.  And
15   while we certainly recognize that Mr. Levoff did not need the
16   money, that he had substantial wealth aside from the money that
17   he made as part of this crime, what his conduct shows, among
18   other things, is that he did this because he could, because
19   again, this was a crime of opportunity.
20             THE COURT:  You know, attorneys in private practice
21   when they have attorney trust accounts, you're right, there's
22   an opportunity and they get in trouble for that.  So, I mean,
23   yes, he had this opportunity there, but what none of us can
24   figure out is he did it in his own name.  He didn't try to
25   conceal his conduct.  At least I don't know that from the
```

```
 1    evidence.

 2              So he had -- deep down he had to figure he was going

 3    to get caught.  How could he not get caught eventually?  And he

 4    did.  Very quickly, really, considering everything, which none

 5    of us can have an explanation for.  Dr. Barber tried her best

 6    to figure it out.  And I don't believe there was an unusually

 7    high lifestyle that he was trying to, you know, support by

 8    extra money.  I don't believe that was the case.  There's

 9    nothing in the record to show he was living excessively or high

10    and therefore he did this for that extra money.  You know, so

11    it's hard to explain, but go ahead.

12              MR. HABER:  Your Honor, it is hard to explain and I'm

13    not sure that anybody, you know, looking back can give a full

14    explanation of what was driving him here, whether it was

15    opportunity, whether it was some sense of indignation, I can do

16    this so I will, or some combination of many factors.

17              But the bottom line is -- and I think that this feeds

18    into where I started, which is regardless of what it was, this

19    is a crime that screams for general deterrence.  And I heard

20    Mr. Levoff's words of attrition here today and -- and, again,

21    things people have said about him that are reflected in the

22    letters, and while it might be that he has learned his lesson

23    and that there is a very low likelihood of recidivism by him,

24    insider trading in general, and I think this case specifically,

25    is one of those cases where the Court can send a message that
```

1    when people are in positions of trust, like the defendant was

2    here, that there are going to be very serious consequences and

3    there are going to be consequences that are collateral to the

4    criminal justice system.  But that when you do commit these

5    crimes, there will be a term of imprisonment that you are going

6    to have to serve.

7              To Mr. Marino's point where he asked, who needs

8    deterrence -- and I'm paraphrasing.  I think it was something

9    along the lines, who needs deterrence when they're in the

10   position to tell people what the rules are.  They obviously

11   know what the rules are and if they're going to violate those

12   rules, they're going to violate those rules regardless of what

13   this Court says and what sentence is imposed here.

14             But I think on the opposite side of that, I think the

15   question of if this Court doesn't impose a term of

16   incarceration in a case like this, people might ask if people

17   who are lawyers at massive companies like Apple don't get some

18   term of incarceration for insider trading, then who does?

19             So with that, Your Honor, we will rest on our briefs

20   unless the Court has any questions for us.

21             THE COURT:  Thank you, Mr. Haber.

22             Both counsel have submitted very thorough and good

23   sentencing memorandum.  So I appreciate that and of course I

24   read and consider all of it.

25             In addition to the guidelines and the 11(c) plea, the

```
 1   Court has to consider its duty under 3553 to impose a sentence

 2   that's sufficient but not greater than necessary and the

 3   factors thereunder, the nature and circumstances of the

 4   offense, and the characteristics of the defendant, the need of

 5   sentence to reflect the seriousness of the offense, to afford

 6   adequate deterrence, and to protect the public, et cetera.

 7          Now, I think we all agree the big issue here is

 8   deterrence.  And it's not specific deterrence, it's general

 9   deterrence.

10          As far the characteristics of the defendant, I have

11   to agree with Mr. Marino.  The letters that have been submitted

12   on Mr. Levoff's behalf are extraordinary.  I mean -- and these

13   are not just letters that were written since his conduct that

14   is before this Court on.  A lot of the letters reflect conduct

15   that he exhibited years before this incident to people in a

16   variety of different ways.  And, you know, each letter is

17   clearly individual.  I've gotten letters before from lawyers

18   and they all have a templet, you know, very simple templet.

19   It's clear the lawyers went out and said, Could you help and

20   send a letter in, and here's a little bit of a format of

21   something that you can say.

22          They don't say it specifically, but they're helping

23   the people.

24          That's not the case here.  These letters, each one,

25   is extraordinary and each one is very individual and most
```

1    importantly, it showed a lot of conduct by the defendant before

2    these criminal acts.  So they're very -- they're very helpful

3    to the Court.  No question about it.

4           Dr. Barber's reports are -- I've gotten her reports

5    before and it's not often, if I can recall, that she's actually

6    made a recommendation based on her extensive and long analysis

7    of Mr. Levoff.  So I mean, that's something that impressed the

8    Court.

9           He's been out on supervised release for almost five

10   years, I think.  It started in February of 2019 and he's been

11   out on supervised release since then without any incident.  And

12   to the contrary, since then he's been very involved in

13   community service.  Now, was that motivated in trying to

14   impress the Court?  I mean, based on the prior letters of what

15   he was doing in his life, I don't think so.  I think it may

16   have been an awakening and freeing experience for him to get

17   this monkey off his back in some way and, unfortunately, in the

18   wrong way, but to free him up to be what he wants to be now and

19   what he demonstrated for a big part of his life, if not all of

20   his life, a willingness to help others and to be involved in a

21   lot of very good acts.

22          Now, the fact is before these letters were received

23   by the government, the government itself recognized this is a

24   very challenging case.  Of course, you agreed to an 11(c) that

25   would agree to a noncustodial up to a 24-month sentence.  And

you're advocating for jail time and I respect that, but you or
somebody in your office must have also been touched or figured
what was this case really all about.  Okay.  Because I've never
seen a plea like this in an 11(c) where it says zero to 24
months.  It might say 4 to 24 or 6 to 24, but somebody in your
office also recognized what we're all struggling with here, and
that was before the letters which affirm that but for this
crazy conduct -- which none of us can explain because he knew
he was going to get caught.  This was not an insider trading
case where I've had where they do it in a different name, they
do it in an alias or they do it with a relative.  This was the
guy who was supposed to be monitoring this stuff doing it.

        So there's some credibility to what Dr. Barber
suggests and what we all say is that he sabotaged himself for a
lot of underlying mental health issues that began when he was
in high school because he dropped out of high school for
depression and mental health issues.  So he's been struggling
with this throughout his adult life.  To his credit, he was
also able to succeed.

        Now, will others be deterred if he doesn't go to
jail?  Well, he lost his law degree.  He's not going to
practice law again.  He's been through the process, which is,
I'm sure, emotionally and mentally very challenging for the
last four years.  He's been out of jail for four years, five
years and he's comported himself well.  I don't think any of

1    us -- he's genuinely remorseful and he's already long on the

2    path for rehabilitation.

3            So sentencing to jail would be okay.  I don't know

4    how many people in his position wouldn't be deterred by what

5    he's going through right now.  You know, if they looked at this

6    case and say, if he doesn't go to jail, we can get away with

7    it.

8            No, you can't.  You'll lose your law degree.  You'll

9    lose your position.  You'll lose your prestige.  You're going

10   to pay forfeiture.  And in this case, he's years on the road to

11   rehabilitation and we've got a very prestigious doctor's

12   report, a doctor who's prestigious who I've had her reports

13   before and rarely has said what she has concluded here about

14   Mr. Levoff.

15           So in terms of a general deterrence, I can't imagine

16   a sentence short of -- and like I said, the government --

17   someone said, you know, this is a difficult case because

18   they're recommending zero to 24 months.  I've never seen that

19   before.  And I'm not saying the government was wrong to do that

20   but the government did that before all of the materials I have

21   in front of me, letters, all of which are individual without

22   question and show conduct that existed long before this

23   incident and has continued ever since and even more so now.

24           So because of that, I don't see that a custodial

25   sentence will actually do any further deterrence.  I can't

1    imagine that somebody in a similar position would look at this

2    and say, well, this was not -- he didn't go to jail.  Well, the

3    sentence I am going to impose is going to impose considerable

4    other requirements on him that are going to be substantial.

5          So with those comments, Mr. Levoff, I'm going to

6    impose sentence.

7          I'm going to take a five-minute break.  Okay.  Just,

8    if you don't mind, let me come back out and finish my thoughts.

9    I'll see you in five minutes.  Just recess for five minutes.

10   Five, ten, minutes.  Don't disappear.

11         THE COURT CLERK:  Remain seated.

12                    (Recess.)

13         THE COURT CLERK:  Remain seated.

14         THE COURT:  All right.  Thank you for your patience.

15         Would Mr. Levoff please rise.

16         Pursuant to the Sentencing Reform Act of 1984, and

17   the Rule 11 (c)(1)(C) of the Federal Rules of Criminal

18   procedure, and 18 U.S.C. 3553(a), it's the judgment of the

19   Court that Gene Levoff is hereby placed or sentenced to

20   probation for a term of four years.

21         While on probation, you must not commit another

22   federal, state or local crime; must refrain from any unlawful

23   use of a controlled substance; must cooperate in the collection

24   of DNA as directed by probation.

25         You must comply with the standard conditions adopted

1    by the court as set forth below.

2            Based on information presented, you're excused from

3    the mandatory drug testing provision.  However, you may be

4    requested to submit to drug testing as necessary by probation.

5    In as much as the defendant has agreed here in open court to

6    pay forfeiture, the Court will order as a condition of

7    probation that forfeiture of $604,000 be paid within ten days.

8            It is further ordered of the Court as a condition of

9    probation that location monitoring is imposed for a period of

10   six months and payment is not waived for the expense of that

11   program.  The details of that program will be sent in the

12   judgment in more detail.

13           It's further ordered that community service in the

14   amount of 2,000 hours is ordered.  You must contribute those

15   2,000 hours of community service over the period of probation

16   or less from the date that probation commences.  Such service

17   shall be without compensation with the specific work placement

18   to be approved by the U.S. Probation Office.

19           It's further ordered that you undergo treatment at a

20   mental health program approved by the probation office until

21   discharged by the Court.  Again, details of that will be set

22   forth in the order.

23           It's further ordered that you must pay to the United

24   States a total fine of $60,000, $10,000 per count on Counts 1

25   through 6.  The fine is due immediately and it is

1  recommended -- well, the fine is due immediately or within 30

2  days of today's date.

3          You must notify the U.S. Attorney of any change in

4  address, and it's also further ordered that you pay the United

5  States a total special assessment of $600.  That's is due

6  immediately.  That's a hundred dollars per count.

7          Just a moment.

8          It's $5,000 per count?

9          MR. FAVAZZA:  That's what we discussed.

10         THE COURT:  So a total amount of $30,000.  The record

11  should reflect my misstatement and I'm correcting it by saying

12  a total amount of $30,000.  Correct.

13         I further advise you have the right to appeal this

14  sentence and if you're unable to pay, you may request the clerk

15  of the court to file a notice of appeal on your behalf.

16         The remaining counts will be dismissed.  Is that

17  correct, Mr. Haber?

18         MR. HABER:  Yes, Your Honor.

19         THE COURT:  And that's -- what -- 7 through 12, I

20  believe it is.

21         MR. HABER:  I believe that's correct.  I'll double

22  check.

23         Yes, that's correct.

24         THE COURT:  All right.  So you'll move to dismiss

25  those, correct?

```
 1              MR. HABER:  The government moves to dismiss those
 2     counts, correct.
 3              THE COURT:  It is so ordered then.  Okay.  That is
 4     the sentence of the Court.
 5              THE COURT CLERK:  Have we dealt with special
 6     conditions?
 7              THE COURT:  I just did.  Those are the conditions of
 8     his probation.
 9              I'm not going to do financial disclosure.  It's not
10     required, unless the government requires that.  I don't believe
11     so.
12              MR. HABER:  No, Your Honor.  We defer to the Court on
13     that.
14              THE COURT:  Okay.  If there's nothing else, we'll be
15     in recess.  All right?
16              MR. MARINO:  Thank you very much, Your Honor.
17              THE DEFENDANT:  Thank you, Your Honor.
18              THE COURT CLERK:  Court is in recess.
19                       (Time noted: 2:35 p.m.)
20
21
22
23
24
25
```

United States District Court
Newark, New Jersey

1    --------------------------------------------------

2        I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.

4

5

6    /S/Diane DiTizii, CCR, CRR, RMR              12/13/2023

7    Federal Official Court Reporter                    Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

Case 2:19-cv-05536-WJM-SDA Document 3B Filed 10/02/24 Page 45 of 88 PageID:
617
Case 2:19-cr-00780-WJM Document 16 Filed 10/24/19 Page 1 of 15 PageID: 31

USAO2017R00679/CAH/DVS

**FILED**

**OCT 2 4 2019**

AT 8:30 ___ 4⁰⁵ PM
WILLIAM T. WALSH
CLERK JB

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | : Hon. |
| | : |
| | : Criminal No. 19-Cr 780 (WJM) |
| v. | : |
| | : 15 U.S.C. §§ 78j(b) and 78ff |
| | : 17 C.F.R. §§ 240.10b–5 and 240.10b5-2 |
| GENE LEVOFF | : 18 U.S.C. §§ 1343 and 2 |

**INDICTMENT**

The Grand Jury in and for the District of New Jersey, sitting at

Newark, charges:

**COUNTS ONE THROUGH SIX**
(Securities Fraud)

**Relevant Individuals and Entities**

1.    At all times relevant to this Indictment:

a.    Company-1 was a global technology company

headquartered in Cupertino, California that designed, developed, and sold

consumer electronics, computer software, and online services. Company-1 was

a publicly traded company whose securities were listed on the NASDAQ Stock

Market.

b.    Defendant GENE LEVOFF ("LEVOFF") was employed

by Company-1 at its headquarters in Cupertino. From in or around 2008

through in or around 2013, LEVOFF, an attorney, was the Director of

Corporate Law at Company-1. From in or around 2013 through September

2018, LEVOFF was the Senior Director of Corporate Law at Company-1. In

that role, LEVOFF functioned as the top corporate attorney at Company-1,
reporting directly to Company-1's General Counsel. Among other things,
LEVOFF was responsible for overseeing Company-1's compliance with
securities laws, which included advising others regarding U.S. Securities and
Exchange Commission (the "SEC") filings and financial reporting. In or around
February 2018, Company-1 named LEVOFF its Corporate Secretary, a title he
maintained until September 2018. Before that, LEVOFF held the role of
Assistant Secretary.

        c.     LEVOFF's responsibilities included ensuring
compliance with Company-1's Insider Trading Policy. Company-1's Insider
Trading Policy prohibited the unauthorized disclosure of any nonpublic
information acquired in the work place and the misuse of material nonpublic
information in securities trading ("Company-1's Insider Trading Policy").

        d.     From in or around September 2008 through in or
around July 2018, LEVOFF served on Company-1's Disclosure Committee,
and, as a result, had access to and obtained Company-1's draft SEC filings and
earnings materials before Company-1 disclosed its quarterly and yearly
financial results to the public. LEVOFF served as one of the Disclosure
Committee's co-chairpersons from in or around December 2012 through in or
around July 2018. As a Disclosure Committee member and high-ranking
Company-1 employee, LEVOFF owed a fiduciary duty to Company-1 and its
shareholders to protect the material nonpublic information regarding
Company-1 to which he had access. LEVOFF further owed Company-1 and its

shareholders a duty not to use such material nonpublic information for his own personal benefit.  Additionally, LEVOFF was subject to certain company-imposed "blackout periods" that prohibited him and others like him with access to material nonpublic information regarding Company-1 from engaging in trades involving Company-1 stock.

e.  First Republic Securities Company, LLC ("First Republic") was a brokerage firm based in San Francisco, California that provided various investment services, including online investing.  LEVOFF maintained an account with First Republic (the "First Republic Account") that he used, among other things, to buy and sell securities, including Company-1 stock.

f.  TD Ameritrade was a brokerage firm based in Omaha, Nebraska that provided online investing services for institutions and individuals.  LEVOFF maintained a brokerage account with TD Ameritrade (the "TD Ameritrade Brokerage Account") that he used, among other things, to buy and sell securities, including Company-1 stock.

g.  Virtu Americas, LLC, f/k/a KCG Americas LLC, f/k/a Knight Capital Markets ("Virtu") was a market maker – i.e., a firm that stands ready to buy and sell a particular stock on a regular and continuous basis at a publicly quoted price, thus providing liquidity to the market.  The servers that housed Virtu's electronic trading systems and executed trades involving those systems were located in New Jersey.

h.      Susquehanna International Group, f/k/a G1 Execution Services, LLC ("G1") was a market maker.  The servers that housed G1's electronic trading systems and executed trades involving those systems were located in New Jersey.

i.      BNY Mellon Capital Markets, LLC ("BNY Mellon") was a market maker.  The third-party affiliate servers that housed BNY Mellon's electronic trading systems were located in New Jersey.

j.      Two Sigma Securities, LLC ("Two Sigma") was a market maker.  The servers that housed Two Sigma's electronic trading systems and executed trades involving those systems were located in New Jersey.

## The Insider Trading Scheme

2.      From in or around February 2011 through in or around April 2016, LEVOFF orchestrated a scheme to defraud Company-1 and its shareholders by misappropriating material nonpublic information regarding Company-1's financial results in order to execute favorable trades involving the securities of Company-1.

## Goal of the Scheme

3.      The goal of the insider trading scheme was for LEVOFF to enrich himself by obtaining money and avoiding losses by purchasing and selling Company-1 securities on the basis of material nonpublic information regarding Company-1 gained by LEVOFF through his position at Company-1.

## **Manner and Means of the Insider Trading Scheme**

4.     The manner and means by which LEVOFF accomplished the goal of the insider trading scheme included:

a.     LEVOFF used his position on Company-1's Disclosure Committee to obtain material nonpublic information regarding Company-1's financial results before Company-1 disclosed that information to the public.

b.     LEVOFF converted the material nonpublic information to his own use by executing trades involving Company-1 stock in the TD Ameritrade Brokerage Account and the First Republic Account before Company-1 disclosed its financial results to the public.  When LEVOFF discovered that Company-1 had strong revenue and net profit for a given financial quarter, he purchased large quantities of Company-1 stock, which he later sold for a profit after Company-1 disclosed the positive earnings information to the public and the market reacted to the news.  Conversely, when LEVOFF learned that Company-1 had lower-than-anticipated revenue and net profit, he sold large quantities of Company-1 stock, thus avoiding the significant losses that would occur after Company-1 disclosed the information to the public and the market reacted to the negative news regarding Company-1's earnings.

c.     LEVOFF executed, and caused to be executed, a number of trades, referenced herein, with market maker counterparties whose electronic trading systems or servers were located in the District of New Jersey, namely, Virtu, G1, BNY Mellon, and Two Sigma.

        d.     LEVOFF executed the favorable trades involving Company-1 stock in violation of Company-1's Insider Trading Policy and during Company-1 black out periods.

        e.     LEVOFF executed trades in furtherance of the scheme from at least as early as April of 2011 through at least as late as April of 2016, realizing profits of approximately $227,000 and avoiding losses of approximately $377,000.

        5.     On or about the dates set forth below, in the District of New Jersey and elsewhere, the defendant,

**GENE LEVOFF**,

did willfully, and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and the facilities of national securities exchanges, use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit: by executing and causing others to execute securities transactions in the securities of Company-1 on the basis of material nonpublic information concerning Company-1 in breach of a duty of

trust and confidence that was owed directly, indirectly, and derivatively to the issuers of those securities, the shareholders of the issuers, and to other persons who were the source of the material nonpublic information, each such transaction constituting a separate count of this Indictment.

| COUNT | APPROXIMATE DATE | SECURITIES TRANSACTION |
|---|---|---|
| One | July 17, 2015 | Sale of approximately 43,750 shares of Company-1 stock by LEVOFF.  Virtu acted as counterparty to some of these trades. |
| Two | July 17, 2015 | Sale of approximately 8,700 shares of Company-1 stock by LEVOFF.  BNY Mellon acted as counterparty to some of these trades. |
| Three | July 20, 2015 | Sale of approximately 7,000 shares of Company-1 stock by LEVOFF.  G1 and Virtu acted as counterparties to some of these trades. |
| Four | July 21, 2015 | Sale of approximately 17,678 shares of Company-1 stock by LEVOFF.  Virtu and Two Sigma acted as counterparties to some of these trades. |
| Five | October 26, 2015 | Purchase of approximately 10,000 shares of Company-1 stock by LEVOFF.  Two Sigma acted as a counterparty for some of these trades. |
| Six | April 21, 2016 | Sale of approximately 4,009 shares of Company-1 stock by LEVOFF.  G1 acted as a counterparty for some of these trades. |

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5 and 240.10b5-2, and Title 18, United States Code, Section 2.

## COUNTS SEVEN THROUGH TWELVE
(Wire Fraud)

      1.     The allegations contained in paragraphs 1, 2, and 4 of Count One are incorporated as if fully set forth herein.

      2.     On or about the dates set forth below, in the District of New Jersey and elsewhere, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, the defendant,

**GENE LEVOFF**,

did, for the purpose of executing and attempting to execute the scheme and artifice, knowingly and intentionally cause to be transmitted by means of wire, radio, or television communications in interstate and foreign commerce, the following writings, signs, signals, pictures, and sounds, to wit, LEVOFF schemed to defraud Company-1 of confidential information related to Company-1's financial results through deceptive means and then converted that information to his own use, through wire transmissions, for the purpose of executing securities transactions in Company-1 stock.

| COUNT | APPROXIMATE DATE | WIRE COMMUNICATION |
|---|---|---|
| Seven | July 17, 2015 | Sale of approximately 5,000 shares of Company-1 stock by LEVOFF, resulting in interstate wire transmissions with Virtu. |

| Eight | July 20, 2015 | Sale of approximately 2,000 shares of Company-1 stock by LEVOFF, resulting in interstate wire transmissions with G1. |
| Nine | July 20, 2015 | Sale of approximately 5,000 shares of Company-1 stock by LEVOFF, resulting in interstate wire transmissions with Virtu. |
| Ten | July 21, 2015 | Sale of approximately 2,000 shares of Company-1 stock by LEVOFF, resulting in interstate wire transmissions with Virtu. |
| Eleven | October 26, 2015 | Purchase of approximately 10,000 shares of Company-1 stock by LEVOFF, resulting in interstate wire transmissions with Two Sigma. |
| Twelve | April 21, 2016 | Sale of approximately 4,009 shares of Company-1 stock by LEVOFF, resulting in interstate wire transmissions with G1. |

In violation of Title 18, United States Code, Sections 1343 and 2.

## FORFEITURE ALLEGATIONS

1.     As the result of committing the offenses constituting specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7), as alleged in Counts One through Seven, inclusive, of this Indictment, defendant GENE LEVOFF shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the conspiracy and securities fraud offenses, and all property traceable thereto.

## SUBSTITUTE ASSETS PROVISION

2.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

> a.     Cannot be located upon the exercise of due diligence;
>
> b.     Has been transferred or sold to, or deposited with, a

third person;

> c.     Has been place beyond the jurisdiction of the Court;
>
> d.     Has been substantially diminished in value; or
>
> e.     Has been commingled with other property which

cannot be subdivided without difficulty;

It is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

A TRUE BILL

Grand Jury Foreperson

CRAIG CARPENITO
UNITED STATES ATTORNEY

Case 2:19-cv-05536-WJM-SDA Document 38 Filed 10/02/24 Page 57 of 88 PageID:
Case 2:19-cr-00780-WJM Document 20-3 Filed 10/24/19 Page 13 of 13 PageID: 66
629

CASE NUMBER: 19 cr 780 (WJM)

# United States District Court
## District of New Jersey

## UNITED STATES OF AMERICA

v.

## GENE LEVOFF

# INDICTMENT FOR

**15 U.S.C. §§ 78j(b) and 78ff**
**17 C.F.R. §§ 240.10b-5 and 240.10b5-2**
**18 U.S.C. §§ 1343 and 2**

A True Bill

_____
Foreperson

CRAIG CARPENITO
UNITED STATES ATTORNEY
FOR THE DISTRICT OF NEW JERSEY

COURTNEY A. HOWARD
DANIEL V. SHAPIRO
ASSISTANT U.S. ATTORNEYS
NEWARK, NEW JERSEY

# EXHIBIT C

1              *UNITED STATES DISTRICT COURT*
               *FOR THE DISTRICT OF NEW JERSEY*

2    _____

3    *UNITED STATES OF AMERICA,*          *CRIMINAL NUMBER:*

4              *v.*                       *19-cr-780*

5    *GENE LEVOFF,*                       *PLEA (held remotely)*

6              *Defendant.*               *Pages 1 - 22*

     _____

7        *Martin Luther King Building & U.S. Courthouse*
         *50 Walnut Street*
8        *Newark, New Jersey 07101*
         *Thursday, June 30, 2022*
9        *Commencing at 1:00 p.m.*

10   *B E F O R E:*              *THE HONORABLE WILLIAM J. MARTINI*
                                 *UNITED STATES DISTRICT JUDGE*

11

     *A P P E A R A N C E S:*

12

         *OFFICE OF THE UNITED STATES ATTORNEY*
13       *BY: DANIEL V. SHAPIRO, ASST. UNITED STATES ATTORNEY*
         *970 Broad Street*
14       *Newark, New Jersey 07102*
         *For the Government*

15

         *MARINO TORTORELLA & BOYLE PC*
16       *BY:  KEVIN HARRY MARINO, ESQUIRE*
         *437 Southern Boulevard*
17       *Chatham, New Jersey 07928*
         *For the Defendant*

18   *A L S O   P R E S E N T:*

19

         *GENE LEVOFF, Defendant*
20       *MICHELLE PICKELS, Special Agent*

21

22       *Melissa A. Mormile, Official Court Reporter*
             *melissa_mormile@njd.uscourts.gov*
23                   *(973) 776-7710*

24

25


               *Proceedings recorded by mechanical stenography;*
           *transcript produced by computer-aided transcription.*

1                          I_N_D_E_X

2

3    PLEA PROCEEDINGS

4    VIDEO CONFERENCING                                    4

5    AGREEMENT

6    FACTUAL BASIS                                        14

7

8

9    FINDINGS BY THE COURT                                21

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (PROCEEDINGS held remotely before The Honorable

2     WILLIAM J. MARTINI, United States District Judge, at 1:00

3     p.m.)

4          THE COURT:  Good afternoon, everyone.

5          Everybody can hear me?

6          THE COURT REPORTER:  Yes, Judge.

7          THE COURT:  We're here for the matter of *United*

8     *States of America v. Gene Levoff*.

9          Can I have the appearances of counsel, please.

10          MR. SHAPIRO:  Good afternoon, your Honor.

11          Daniel Shapiro, assistant United States attorney, for

12     the government.

13          MR. MARINO:  Good afternoon, your Honor.

14          Kevin Marino, Marino Tortorella & Boyle, for Gene

15     Levoff.

16          THE COURT:  Good afternoon to both of you.

17          It's my understanding we're here because Mr. Levoff is

18     offering a plea to six counts of an indictment pursuant to a

19     criminal procedure 11(c)(1)(C).

20          Before I begin with that, I want to make sure that the

21     defendant is aware we're proceeding virtually this way instead

22     of in court in person.

23          Mr. Levoff and Mr. Marino, you understand you have a

24     right, if you wanted to, to have this matter in person here in

25     court.

4

1          I understand you opted to have this proceeding

2    virtually as we're doing.

3          I want to make sure you know you have that right to

4    come to court and proceed in person.

5          Do you understand that?

6            THE DEFENDANT:  Yes, your Honor.

7          Thank you.

8            MR. MARINO:  Yes, your Honor.

9            THE COURT:  Mr. Levoff, you've discussed this with

10   your lawyer?

11             THE DEFENDANT:  Yes, your Honor.

12             THE COURT:  You agreed to proceed virtually the way

13   we are so far?

14             THE DEFENDANT:  Yes, your Honor.

15             THE COURT:  I'm satisfied that he understands he

16   would have the right to have this proceeding in court.

17         He is agreeing to have it done by video

18   teleconferencing.

19         I will sign that form and file that order with the

20   Court.

21         Before we proceed any further, Mr. Levoff, we have to

22   have you sworn.

23         Ms. Hansen, would you swear Mr. Levoff, please.

24

25             GENE DANIEL LEVOFF, Sworn:

*United States District Court*
*Newark, New Jersey*

1                THE DEFENDANT:  Gene Levoff.

2                THE COURTROOM DEPUTY:  Thank you very much.

3                THE COURT:  Mr. Levoff, please listen to me closely

4     as I ask you a number of questions.

5           Could you state what your full name is for the record

6     again.

7                THE DEFENDANT:  Gene Daniel Levoff.

8                THE COURT:  How old are you, sir?

9                THE DEFENDANT:  48.

10               THE COURT:  You understand and speak English?

11               THE DEFENDANT:  Yes, your Honor.

12               THE COURT:  And do you have any medical or

13    psychiatric condition, which would interfere your

14    understanding me today?

15               THE DEFENDANT:  No, your Honor.

16               THE COURT:  Have you taken any medications or any

17    alcohol in the last 24 hours to the extent it would interfere

18    with your understanding me today?

19               THE DEFENDANT:  No, your Honor.

20               THE COURT:  You have an attorney, Mr. Marino.

21          Are you satisfied with his services?

22               THE DEFENDANT:  Yes, your Honor.

23               THE COURT:  I'm sure he provided you with what's

24    called a copy of the indictment, which is the document which

25    charges you with a number of crimes, which I'll get into more

1  specifically.

2        The indictment is a document, which sets forth the

3  criminal felonies against you.

4        It's returned by a federal grand jury.

5        Do you understand that?

6          THE DEFENDANT:  Yes, your Honor.

7          THE COURT:  The indictment, for the record, I'm sure

8  you've gone over it with your lawyer thoroughly.

9        Correct?

10         THE DEFENDANT:  Yes, your Honor.

11         THE COURT:  The indictment at the first counts,

12  Counts One and Six of the indictment, for which I understand

13  you are offering a plea of guilty today, charges that on or

14  about the dates set forth in the individual counts, in New

15  Jersey and elsewhere, you did willfully and knowingly,

16  directly and indirectly, by use of means and instrumentalities

17  of interstate commerce, and of the mails and the facilities of

18  the National Securities Exchanges, use and employ, in

19  connection with the purchase and sale of securities,

20  manipulative, and deceptive devices and contrivances, in

21  violation of our federal law by:

22        (A) employing devices, schemes, and artifices to

23  defraud; (b) making untrue statements of material facts and

24  omitting to state material facts necessary in order to make

25  the statement made, in the light of the circumstances under

1   which they were made, not misleading; and by (c) engaging in

2   acts and practices and courses of business which operated and

3   would operate as a fraud and deceit upon persons, to wit:  by

4   executing and causing others to execute securities

5   transactions in the securities of Company 1 on the basis of

6   material nonpublic information concerning Company 1 in breach

7   of duty of trust and confidence that was owed directly,

8   indirectly, and derivatively to the issuers of those

9   securities, the shareholders of the issuers, and to other

10  persons who were the source of the material nonpublic

11  information, each such transaction constituting a separate

12  count of the indictment.

13          That's what you are charged with in Counts One through

14  Six.

15          Do you understand that?

16          THE DEFENDANT:  Yes, your Honor.

17          THE COURT:  Those charges are violations of our

18  criminal law; specifically, Title 15 Section 78(j) and

19  10(b)(5) of our criminal code.

20          Also, you should understand that if I accept your

21  guilty plea, I understand you are offering your plea pursuant

22  to a plea agreement worked out with the government pursuant to

23  criminal procedure Rule 11(c)(1)(C).

24          You are offering a plea to Counts One through Six,

25  which I have just read to you.

*United States District Court*
*Newark, New Jersey*

1          And under that plea agreement, the parties have agreed

2     that between the parties that your sentence would be somewhere

3     between zero and 24 months.  Also, you would have a three-year

4     supervised release.

5          Is that true, Counsel?

6          MR. MARINO:  That is correct, your Honor.

7          MR. SHAPIRO:  Yes, your Honor.

8          THE COURT:  Is that your understanding also, Mr.

9     Levoff?

10         THE DEFENDANT:  Yes, your Honor.

11         THE COURT:  Again, that's assuming the Court accepts

12    that condition.

13         I generally do not make that determination today.  I

14    wait until I see the presentence report and make that

15    determination.  Obviously, if I don't accept it, you have a

16    right to go back and go to trial; or to renegotiate a plea

17    with the government.  I just want you to know I'm not

18    accepting it today.  Although, most of the time, I will accept

19    an 11(c) plea, but if I were to find for some reason it's not

20    acceptable to me, you would have a right to go back to base 1

21    basically, go to trial or renegotiate another plea.

22         Do you understand everything I've said so far?

23         THE DEFENDANT:  Yes, your Honor.

24         THE COURT:  You should also understand that if you

25    plead guilty if I accept it today, you face a penalty of up to

1   20 years in prison and a fine of up to around $5 million, in

2   addition to that, a term of supervised release of not more

3   than three years.  You may receive a term of supervised

4   release of not more than three years, which would begin at the

5   expiration of any time in prison you may have to serve.

6           Do you understand that?

7               THE DEFENDANT:  Yes, your Honor.

8               THE COURT:  You should also understand that if you

9   violate the terms and conditions of supervised release, in all

10  likelihood you will be faced with either more time on

11  supervised release or incarceration or both.

12          Do you understand all of that?

13              THE DEFENDANT:  Yes, your Honor.

14              THE COURT:  Of course, there is, also, I understand

15  an agreement to forfeit a certain amount of funds.

16          Is that correct, Counsel?

17              MR. MARINO:  That is right, your Honor.

18              MR. SHAPIRO:  Yes, your Honor.

19              THE COURT:  That number is 200?

20              MR. SHAPIRO:  It is on page 5 of the plea memo.

21  $604,000.

22              THE COURT:  There it is.

23          So under this plea agreement, you agreed to forfeit the

24  sum of $604,000.

25          Is that correct?

1          THE DEFENDANT:  Yes, your Honor.

2          THE COURT:  You should also understand that in

3    federal court there is not what's called parole, which means

4    that if you do receive a custodial sentence, you will actually

5    serve in a prison facility, some facility, 85 to 90 percent of

6    the custodial sentence.

7          Do you understand that?

8          THE DEFENDANT:  Yes, your Honor.

9          THE COURT:  Also, I should ask you:  Are you a

10   citizen of the United States?

11         THE DEFENDANT:  Yes, your Honor.

12         THE COURT:  By pleading guilty, you are also giving

13   up a number of rights that you have as a defendant being

14   charged with a felony.  Most importantly, you are giving up

15   your right to a jury trial, which would be a proceeding in a

16   courtroom where I am.  At that time 12 citizens would be

17   empaneled to sit as jurors.  At such a trial, you are presumed

18   to be innocent and the government would have the burden of

19   proving the charges against you beyond a reasonable doubt.

20         Do you understand that?

21         THE DEFENDANT:  Yes, your Honor.

22         THE COURT:  They would have to satisfy all 12 jurors

23   that they met that burden before you could be found guilty.

24         Do you understand that?

25         THE DEFENDANT:  Yes, your Honor.

1          THE COURT:  The jurors would have to be unanimous.

2    That means all 12 jurors would have to agree they found you

3    guilty and the government met that burden.

4          Do you understand that?

5          THE DEFENDANT:  Yes, your Honor.

6          THE COURT:  You should also understand that at such a

7    trial you have no duty to put forth any defense.  You could

8    remain silent personally.  You wouldn't have to call any

9    witnesses or offer any documents.  If you did all of that, the

10   jury is not to infer any wrongdoing or guilt against you for

11   remaining silent.

12         Do you understand that?

13         THE DEFENDANT:  Yes, your Honor.

14         THE COURT:  If you wished, I would advise them of

15   that and instruct them they are not to infer any wrongdoing

16   against you.  That's a decision you would make at that time if

17   you went that course.

18         Do you understand that?

19         THE DEFENDANT:  Yes, your Honor.

20         THE COURT:  I also understand that you and the

21   government have entered into a plea agreement, which is set

22   forth in a letter dated April 5, 2022.

23         Isn't that your signature on page 8?

24         THE DEFENDANT:  Yes, your Honor.

25         THE COURT:  Did you sign that on May 11, 2022, after

1  you read it thoroughly and you went over it thoroughly with

2  your lawyer?

3        THE DEFENDANT:  Yes, your Honor.

4        THE COURT:  You signed it after your lawyer answered

5  any questions you may have had about this agreement?

6        THE DEFENDANT:  Yes, your Honor.

7        THE COURT:  Did you sign it voluntarily without

8  anybody forcing you to do that?

9        THE DEFENDANT:  Yes, your Honor.

10       THE COURT:  You should understand that the agreement

11  is an agreement between you and the government as to this

12  disposition of this case.

13       If somebody made any kind of a promise to you, your

14  lawyer, the prosecutor, or anybody, agent, that's not in this

15  agreement, whatever they said to you would not be binding on

16  the Court or on the proceedings.

17       Do you understand that?

18       THE DEFENDANT:  Yes, your Honor.

19       THE COURT:  You should also understand it's all

20  important, but when it comes to the sentencing, that's in the

21  discretion of myself as the Judge.

22       There are what we call advisory guidelines that are

23  advisory.

24       I, of course, consider those along with a lot of other

25  factors, but if I thought it was a reasonable sentence I could

1  sentence you up to the maximum I just plained if I thought it

2  was reasonable.

3       Do you understand that?

4        THE DEFENDANT:  Yes, your Honor.

5        THE COURT:  I also see that you and the government

6  have entered into a number of what's called stipulations that

7  are set forth in page 9 referred to as Schedule A.

8       Now, those are stipulations between you and the

9  government mostly as to facts, maybe as to some law.

10      What you should understand is that if I were to make a

11  finding that was different than what you have agreed to with

12  the government, my finding would be final and you would not

13  have the right to withdraw your guilty plea.

14      Do you understand that?

15       THE DEFENDANT:  Yes, your Honor.

16       THE COURT:  You should also understand, I want to

17  make sure you understand this -- after I sentence you, you

18  would have a right to appeal my sentence to a higher court for

19  review.  However, under page 5, the language in page 5 under

20  waiver of appeal in postsentencing rights, you are limiting

21  that right somewhat as per the language in that paragraph.

22      Did you go over that with your lawyer?

23       THE DEFENDANT:  Yes, your Honor.

24       THE COURT:  Are you agreeing to that voluntarily as

25  well?

1          THE DEFENDANT:  Yes, your Honor.

2          THE COURT:  Mr. Marino, did you fill out the Rule 11

3    questionnaire?

4          MR. MARINO:  I don't believe we did, your Honor.

5          THE COURT:  Ms. Hansen, do you know if they got a

6    copy of the Rule 11 questionnaire?

7          THE COURTROOM DEPUTY:  I do not have it.

8          THE COURT:  We don't have it?

9       Mr. Shapiro.

10         MR. SHAPIRO:  I don't have a completed one, but I

11   could certainly send one to Mr. Marino.

12         I can pull one down if it hasn't been completed yet.

13         THE COURT:  Well, why don't you do that after the

14   proceedings.

15         Most of what's in that Rule 11 questionnaire, a lot of

16   it is covered by today, but for the record, I want to have him

17   fill that out, Mr. Marino --

18         MR. MARINO:  I will take care of that, your Honor.

19         THE COURT:  -- sign it and send it in; swear to it

20   and send it in.

21       Okay?

22         MR. MARINO:  Certainly.

23         THE COURT:  In order for me to determine if I can

24   accept your guilty plea, I need to know what you did to

25   violate the law.

1           Please listen to the questions that will now be asked

2   of you by the assistant United States attorney.

3           Depending on your answers, I will determine if I could

4   accept your guilty plea, please.

5           Mr. Shapiro.

6            MR. SHAPIRO:  Thank you, your Honor.

7           Mr. Levoff, from in or around 2008 through in or around

8   2013, were you an attorney and the director of corporate law

9   at Apple?

10           THE DEFENDANT:  Yes, sir.

11           MR. SHAPIRO:  From in or around 2013 through

12   September 2018, were you the senior director of corporate law

13   at Apple?

14           THE DEFENDANT:  Yes, sir.

15           MR. SHAPIRO:  In that role, did you function as the

16   top corporate attorney at Apple reporting directly to Apple's

17   general counsel?

18           THE DEFENDANT:  Yes, sir.

19           MR. SHAPIRO:  Among other things, were you

20   responsible for overseeing Apple's compliance with securities

21   laws, which included advising others regarding SEC filings and

22   financial reporting?

23           THE DEFENDANT:  Yes, sir.

24           MR. SHAPIRO:  In or around February 2018, were you

25   elevated from the role of assistant corporate secretary to

1  corporate secretary, a title you maintained until at least

2  July 2018?

3        THE DEFENDANT:  Yes, sir.

4        MR. SHAPIRO:  Did your responsibilities include

5  ensuring compliance with Apple's insider trading policy?

6        THE DEFENDANT:  Yes, sir.

7        MR. SHAPIRO:  Did that insider trading policy

8  prohibit the unauthorized disclosure of any nonpublic

9  information acquired in the workplace and the misuse of

10 material nonpublic information in securities trading?

11       THE DEFENDANT:  Yes, sir.

12       MR. SHAPIRO:  From in or around September 2008

13 through in or around July 2018, did you serve on Apple's

14 disclosure committee, and, as a result, had access to and

15 obtained Apple's draft SEC filings and earnings materials

16 before Apple disclosed its quarterly and yearly financial

17 results to the public?

18       THE DEFENDANT:  Yes, sir.

19       MR. SHAPIRO:  Did you serve as one of the disclosure

20 committee's cochair persons from in or around December 2012

21 through in or around July 2018?

22       THE DEFENDANT:  Yes, sir.

23       MR. SHAPIRO:  Do you agree that as a disclosure

24 committee member and high-ranking Apple lawyer, you owed a

25 fiduciary duty to Apple and its shareholders to protect the

1  material nonpublic information regarding Apple to which you

2  had access?

3      THE DEFENDANT:  Yes, sir.

4      MR. SHAPIRO:  Do you agree that you further owed

5  Apple and its shareholders a duty not to use such material

6  nonpublic information for your own personal benefit?

7      THE DEFENDANT:  Yes, sir.

8      MR. SHAPIRO:  Were you also subject to certain

9  company-imposed blackout periods that prohibited you and

10  others like you with access to material nonpublic information

11  regarding Apple from engaging in trades involving Apple stock?

12      THE DEFENDANT:  Yes, sir.

13      MR. SHAPIRO:  As a result of your employment at

14  Apple, did you obtain material nonpublic information regarding

15  Apple's financial results before Apple disclosed that

16  information to the public?

17      THE DEFENDANT:  Yes, sir.

18      MR. SHAPIRO:  Did you then convert the material

19  nonpublic information to your use by executing trades

20  involving Apple stock in your brokerage accounts before Apple

21  disclosed its financial results to the public?

22      THE DEFENDANT:  Yes, sir.

23      MR. SHAPIRO:  Did you execute the favorable trades

24  involving Apple stock in violation of Apple's insider trading

25  policy and during Apple's blackout periods?

1          THE DEFENDANT:  Yes, sir.

2          MR. SHAPIRO:  Did you execute trades in furtherance

3    of the scheme from at least as early April 2011 through at

4    least as late as April 2016?

5          THE DEFENDANT:  Yes, sir.

6          MR. SHAPIRO:  As a result of this scheme, did you

7    realize profits of approximately $227,000 and avoid losses of

8    approximately $377,000?

9          THE DEFENDANT:  Yes, sir.

10          MR. SHAPIRO:  Did those trades include the following

11    which are charged in Counts one through Six of the indictment

12    criminal number 19-780:

13          A.  On July 17, 2015, did you sell approximately 43,750

14    shares of Apple stock while in possession of and relying on

15    material nonpublic information as described in Count One?

16          THE DEFENDANT:  Yes, sir.

17          MR. SHAPIRO:  On July 17, 2015, did you sell

18    approximately 8,700 shares of Apple stock while in possession

19    of and relying on material nonpublic information as described

20    in Count Two?

21          THE DEFENDANT:  Yes, sir.

22          MR. SHAPIRO:  On July 20, 2015, did you sell

23    approximately 7,000 shares of Apple stock while in possession

24    of and relying on material nonpublic information as described

25    in Count Three?

1          THE DEFENDANT:  Yes, sir.

2          MR. SHAPIRO:  On July 21, 2015, did you sell

3   approximately 17,678 shares of Apple stock while in possession

4   of and relying on material nonpublic information as described

5   in Count Four?

6          THE DEFENDANT:  Yes, sir.

7          MR. SHAPIRO:  On October 26, 2016, did you purchase

8   approximately 10,000 shares of Apple stock while in possession

9   of and relying on material nonpublic information as described

10  in Count Five?

11         THE DEFENDANT:  Yes, sir.

12         MR. SHAPIRO:  On April 21, 2016, did you sell

13  approximately 4,009 shares of Apple stock while in possession

14  of and relying on material nonpublic information as described

15  in Count Six?

16         THE DEFENDANT:  Yes, sir.

17         MR. SHAPIRO:  Do you agree that when you executed

18  other trades in the scheme, you did so while in possession of

19  and relying on material nonpublic information about Apple?

20         THE DEFENDANT:  Yes, sir.

21         MR. SHAPIRO:  Do you also agree that you acted

22  willfully and knowingly and by use of the means and

23  instrumentalities of interstate commerce in connection with

24  the trades you placed in furtherance of the scheme described

25  above and in the indictment?

1           THE DEFENDANT:  Yes, sir.

2           MR. SHAPIRO:  Your Honor, the United States also

3    represents to the Court that if this matter were to have

4    proceeded to trial, the United States could be proven each and

5    every element of the crime charged in Counts One through Six

6    of the indictment beyond a reasonable doubt on the basis of

7    independent evidence.

8           Based on this and the questions that the defendant just

9    answered, the United States believes that the defendant's

10   answers to the foregoing questions, coupled with these

11   representations provide a sufficient factual basis for the

12   acceptance of this plea of guilty to Counts One through Six of

13   the indictment.

14          THE COURT:  Thank you, Mr. Shapiro.

15          Let me just remind counsel.

16          With respect to form 11 questionnaire, have your client

17   sign, fill that out, Mr. Marino and swear to it.

18          Send it over to Mr. Shapiro.

19          Mr. Shapiro, if you think there is anything in that

20   form that I should be aware of that's for some reason

21   problematic, let us know right away.  Okay?

22          Then we will file it with the Court.

23          MR. SHAPIRO:  Yes, your Honor.

24          THE COURT:  Mr. Levoff, it's my understanding also if

25   I accept your guilty plea to Counts One through Six, at

1    sentencing Count Seven through Twelve will be dismissed.

2         Is that right, Mr. Shapiro?

3         MR. SHAPIRO:  Yes, your Honor, at the time of

4    sentencing.

5         THE COURT:  How do you plead to Counts One through

6    Six, Mr. Levoff, guilty or not guilty?

7         THE DEFENDANT:  Guilty, your Honor.

8         THE COURT:  Based upon your sworn answers here in

9    this proceeding, it is the finding of the Court in the case of

10   *United States of America v. Gene Levoff* that the defendant is

11   fully competent and capable of entering an informed plea, that

12   the defendant is aware of the nature of the charges and the

13   consequences of the plea, and that the plea of guilty to

14   Counts One through Six is a knowing and voluntary plea

15   supported by an independent basis in fact containing each of

16   the essential elements of the offense.

17        The plea to those counts is, therefore, accepted and

18   the defendant is now adjudged guilty of Counts One through Six

19   of indictment number 19-780.

20        Do we have a sentencing date?

21        THE COURTROOM DEPUTY:  November 10th at 11:00 a.m.

22        THE COURT:  Is there anything else, Counsel?

23        MR. MARINO:  I don't believe so, your Honor.

24        We will get the Rule 11 form filed and executed.

25        THE COURT:  Thank you very much.

1          MR. SHAPIRO:  No.

2          THE COURT:  Good to see you everybody.

3      Have a good holiday.

4          MR. SHAPIRO:  Thank you, your Honor.

5          MR. MARINO:  Thank you very much, your Honor.

6          THE COURTROOM DEPUTY:  Court is in recess.

7  (Whereupon the proceedings are adjourned at 1:23 p.m.)

8              *         *         *

9      FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE

10

11          I certify that the foregoing is a correct transcript

12  from the record of proceedings in the above-entitled matter.

13

14  /S/ Melissa A. Mormile RDR, CCR, CRCR       6/30/2022

15  Official Court Reporter                        Date

16

17

18

19

20

21

22

23

24

25

*United States District Court*
*Newark, New Jersey*

# EXHIBIT D

# REDACTED

# EXHIBIT E

2017R00679/JLH/PAL/gr

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. William J. Martini, U.S.D.J. |
| v. | : | Crim. No. 19-780 (WJM) |
| GENE LEVOFF, | : | SATISFACTION OF |
| | | CRIMINAL FORFEITURE |
| Defendant. | : | <u>MONEY JUDGMENT</u> |

WHEREAS, a criminal forfeiture money judgment was entered in the above-captioned action on December 14, 2023 against defendant Gene Levoff in the amount of $604,000.00; and

WHEREAS, said judgment has been paid in full.

THEREFORE, full and complete satisfaction of said criminal forfeiture money judgment is hereby acknowledged, and the Clerk of the Court is hereby authorized and directed to make entry on the docket of the full and complete satisfaction of said judgment.

DATED this 22nd day of December, 2023.

PHILIP R. SELLINGER
United States Attorney

<u>s/Joshua L. Haber</u>
By: JOSHUA L. HABER
Assistant United States Attorney

# EXHIBIT F

# REDACTED

# EXHIBIT G

# REDACTED